**SUBURBAN BANK OF KANSAS CITY,**
Petitioner-Appellant,

v.

**JACKSON COUNTY STATE BANK,**
Defendant-Respondent.

No. 23026.

Kansas City Court of Appeals.

Missouri.

Dec. 7, 1959.

County. On July 2, 1957, respondent, Jackson County State Bank, filed an application with the Commissioner of Finance for a bank charter. The Commissioner denied the application. Thereafter the respondent duly filed an appeal to the State Banking Board. After a hearing said Board ordered the Commissioner to issue a charter to respondent. On April 7, 1958, appellant filed its petition for review in the Circuit Court of Cole County. After a hearing, and on November 21, 1958, the latter court entered judgment affirming the decision of the State Banking Board.

■ The standard for review by courts of decisions of an administrative body is stated in Bartholomew v. Board of Zoning Adjustment, Mo.App., 307 S.W.2d 730, 734:

"The circuit court may not substitute its own judgment on the evidence for that of the board (citations), but the circuit court is authorized to decide whether the (administrative tribunal) reasonably could have made its findings and reached its result upon consideration of all of the evidence before it, and to set aside decisions clearly contrary to the overwhelming weight of the evidence (citations)."

■ Therefore, the question presented in this appeal is whether or not there is competent and substantial evidence upon the whole record, not contrary to the overwhelming weight of the evidence, to support the only two findings of the State Banking Board which are here in dispute, namely:

"(10) The convenience and needs of the community to be served by the proposed bank justify and warrant the opening of such bank at the location proposed and available.

"(11) The probable volume of business in such locality is sufficient to insure and maintain the solvency of the banks and trust companies existing in the locality and of the proposed bank, without endangering the safety of any bank in the locality as a

---

McFadden & Blair, Jefferson City, Skelton & Bradley, Lexington, for petitioner-appellant.

Edgar Shook, E. Frederick Beihl, Sebree, Shook, Hardy & Ottman, Kansas City, for defendant-respondent.

BROADDUS, Judge.

This is an appeal by the petitioner, Suburban Bank of Kansas City, from a final judgment of the Circuit Court of Cole

place of safe deposit of public and private moneys."

The testimony on behalf of respondent was that Elbert H. Green, who resided in Springfield, Missouri, had determined to form a bank in Kansas City. Mr. Green has had considerable experience in substantial business enterprises. He has engaged in consumer financing, and has invested in banks and related fields, as well as in commercial property and business. After consulting with certain persons in Kansas City, Mr. Green selected F. Phillip Giltner, Vice President and Assistant to the President of the City National Bank of Kansas City, to assist him in selecting a site for the location of the proposed bank. Mr. Giltner is also Secretary and a member of the Board of Directors of the Overland Park State Bank, a suburban bank, and has had experience in the supervision of suburban banking. He was a practicing attorney, representing certain financial institutions, prior to his association with the City National Bank.

Mr. Green and Mr. Giltner spent several days together in Kansas City and toured a considerable portion of the metropolitan area of the city in search of a likely location for a bank. They finally selected what they considered a highly desirable location, the northeast corner of the intersection of Prospect Avenue and Meyer Boulevard.

The selected tract has a frontage of a little more than 200 feet on Meyer Boulevard and about the same number of feet on Prospect. An entrance has been authorized by the City Park Board from Meyer Boulevard and also from Prospect Avenue. The plans provide for a parking area of 50 cars, and for the erection of a two level structure, costing $150,000.

Appellant, Suburban Bank, is located at 6920 Prospect Avenue, about five blocks from the proposed bank.

The testimony introduced before the Banking Board disclosed that a daily average of 25,000 people pass the proposed location of the bank going north and south on Prospect Avenue, while 15,000 people pass the intersection going east and west on Meyer Boulevard. Mr. Giltner testified that this location at the intersection of north-south and east-west main arteries, and its "great convenience" were favorable factors. Meyer Boulevard was described as probably the most prominent boulevard in Kansas City, with six lanes of traffic. Meyer runs into Paseo, which is the eastern boundary of one of the new and most important shopping center developments in Kansas City.

From the standpoint of residences, the trade area of the proposed bank is in a state of rapid development, and the southeastern portion of Kansas City is experiencing a great growth. Meyer Boulevard, both east and west of the proposed bank site, and the area adjacent to Meyer Boulevard, is the location of an extensive development of substantial, high-cost residences. To the north, northeast, south, southeast and southwest there are well developed and thickly populated residential areas. The Linn Estate, a 200 acre tract located two blocks from the proposed site of the bank, is the only undeveloped tract of its size within the corporate limits of Kansas City. It is a most desirable location for business or a high-price residential development, and it demands by its location and size that a substantial type of improvement take place there.

Immediately across from the bank on Prospect Avenue, the Nine Million Dollar 384-bed Research Hospital is in the process of construction. Mr. Mac F. Cahal, Executive Director and General Counsel of the American Academy of General Medicine, and a director of the bank, estimated that this new hospital will receive $10,000 per day for hospital room charges alone and that it will employ 1,000 persons with an approximate annual payroll of $2,500,000. The hospital staff is estimated at 270 doctors, not including interns and residents. Dr. Claude Hunt, a member of respondent's Board of Directors, is Chief of the Sur-

gical Department of the hospital. Immediately to the north of the Research Hospital site a $1,800,000 medical building, with office space for 20 doctors, is proposed, with several smaller medical buildings planned. In addition, there is under construction not far away a Baptist Hospital of 300 beds, which will employ 500 persons with an annual payroll of approximately $1,500,000 with a staff of 175 doctors.

Witness Cahal stated that the trend in Kansas City for suburban doctors' offices is toward the area to be served by the proposed bank and that the proposed bank would be a tremendous convenience to the medical center. He indicated that the location of the medical facilities would result in many nurses, technicians, interns, residents and some doctors moving into the immediate area of the proposed bank. Mr. Cahal estimated that from the medical center and from the doctors in the area, the proposed Jackson County Bank would receive, by the end of the second year of its operation, deposits in the amount of $1,000,-000.

From an industrial standpoint the trade area of the proposed bank is experiencing the greatest development in the Kansas City area. The same thing is true of the commercial expansion of the area. Directly across Meyer Boulevard is located one of the largest stores in the Parkview Drug chain. Mr. John Small, Executive Vice-President of the Parkview Drugs, is a Director of the proposed bank. Three blocks to the west is located the Headquarters of the Nazarene Church, with 250 employees, along with the National Seminary for that Church, with 200 students. A publishing company for the Nazarene Church, employing 250 persons with an estimated annual payroll of $1,800,000 and a sales volume of $5,000,000 will be built in the immediate future. The financial head of the Nazarene Church indicated he was happy to see the new bank and would carry substantial balances with the bank.

One mile west on Meyer Boulevard the J. C. Nichols Company is in the process of constructing an $18,000,000 shopping center, which will include a Macy's Department Store and 25 smaller business shops. The shopping area is designed to provide parking accommodations for 2,500 cars. Much of the traffic in this shopping center will use Meyer Boulevard and will pass by respondent bank. The bank closest to that shopping center, the Blue Hills Bank of Commerce, had no representative at the hearing, nor has it made any protest of record to the granting of a charter to respondent.

One block north of the proposed bank, there is one of the finest of the Milgram grocery stores. This store has an annual sales volume in excess of $3,000,000 and has 15,000 customers per week. One-half block north of the proposed bank a shopping center is planned by the Milgram Company, and immediately across Prospect Avenue from the Milgram planned shopping center, the J. C. Nichols Company has planned and is in the process of starting to build a business development. There is business running all the way up and down Prospect, north and south, for an unlimited stretch.

Ten blocks east of the proposed bank is the Byram's Ford Industrial Park Development. Witness Giltner said it was one of the most beautiful industrial areas he had ever seen and stated that he would expect banking business from the area. Mr. Alexander J. Barket is in charge of this Development and testified at great length as to this Industrial area. The area consists of 73 acres, and development was started in April, 1956. In excess of a million and a half dollars has already been invested in the Development. The area is served by the Missouri Pacific and the Frisco Railroads. The Dupont Company, A. S. Aloe Company, Wagner Electric Company, Gateway Luggage Manufacturing Company, and Truog-Nichols Company maintain regional offices, manufacturing

plants, retail sales outlets, and warehouses in this industrial area. Mr. Clyde Nichols of Truog-Nichols Company is a director of the bank. These companies employ a total of more than 500 employees. There is land in this site for further development and options have been taken for substantial additional areas and several substantial firms are currently negotiating for large sites in this area for purposes of erecting plants and warehouses.

As is to be noted the statute (sec. 362.-040, V.A.M.S. as amended in 1955) provides that the Board must be satisfied "that the convenience and needs of the community to be served justify and warrant the opening of such bank therein." There has been no Missouri decision defining the term "convenience and needs of the community". The courts of other states have made it clear that the purpose of similar clauses in their banking statutes is not to prevent new banks from entering the field, but rather to insure the existence of a healthy banking system. *This is true, even though existing banks have been rendering adequate service* (Banking Law Journal, Vol. 74, No. 11, Nov. 1957, page 928). Too strict a monopoly in the banking field is regarded as being as undesirable as having an excessive number of banks. The Supreme Court of South Dakota in construing the term "public convenience and necessity" contained in its State Banking Act said:

"While the adequacy of existing banking facilities may be considered in the determination of public convenience and necessity it does not follow that because there are adequate banking facilities that public convenience and necessity justifying another bank cannot exist. If such were the case the statute would tend to deter competition and foster monopoly." Wall v. Fenner, 1956, 76 S.D. 252, 76 N.W.2d 722, 726. Similarly, the Supreme Court of Michigan in Moran v. Nelson, 1948, 322 Mich. 230, 33 N.W.2d 772, 778, said:

"If the banking commissioner concluded * * * that plaintiffs' application should be denied because he was of the opinion the existing banking facilities 'render complete banking service, both as to commercial service as well as industrial', we think such reason was not alone controlling." See also State ex rel. Dybdal v. State Securities Commission, 145 Minn. 221, 176 N.W. 759.

■ One good indication of whether or not the convenience and needs of the community to be served justify the respondent bank is the amount of deposits which the proposed bank would obtain during the first years of its operation. If the deposits and accompanying business of the bank are substantial, then the bank meets the convenience of the community and there is need for the bank.

"Insofar as public convenience and advantage is concerned, he (the administrative official charged with the responsibility of granting or denying bank charters) is primarily interested in the amount of deposits which can be generated (usually within three years), the people and the business to be served, the chances of successful operation and the effect on existing financial institutions." Banking Law Journal, supra, p. 931.

Opinions as to the prospects of the proposed bank were submitted by several witnesses well qualified to give such opinions. They estimated that the deposits for the first year would be $1,800,000 to $2,000,-000, and for the third year $4,000,000 to $4,250,000.

The examiner, in his report stated that he had made an exhaustive survey and had found that some twenty-eight establishments north of 69th Street were anxious for the new bank and would do business with it. He further stated that the Nazarene Church, which was contemplating further expansion looked favorably upon the proposed bank. Witness Green testi-

fied to like effect, and stated that the Church would carry substantial balances with the bank. Witness Giltner testified that the regional headquarters for the All-State Insurance Company, with an annual payroll of $1,700,000, have assured the bank that they are very desirous of having a new banking institution in the location proposed. Witness Barket, the developer of the important Byram's Ford Industrial Park area, testified that Kansas City is growing toward the southeast; that in his opinion there is need of a bank on the proposed site, and, "we have been stymied because of the lack of banking facilities in several instances." Witness Cahal testified that the proposed bank would be a tremendous convenience to the Research Hospital Center.

■ We are of the opinion that the finding of the Banking Board that the convenience and needs of the community to be served by the proposed bank warrant the opening of such bank at the proposed location was based upon substantial evidence.

■ The other question considered by the Board and the subject of review here is whether the opening of the respondent bank in the locality will endanger the solvency of the new bank or existing banks. Appellant is the only bank or trust company actually located in the community to be served by the proposed bank, and is the only bank whose continued solvency has been discussed in these proceedings. It is significant that the Blue Hills Bank of Commerce, the closest competing bank other than appellant, did not appear at the hearing and did not send the commissioner a letter in connection with the proposed bank's application.

The testimony of Mr. Goppert, President of appellant, was the only testimony offered which would indicate that granting the charter to respondent would affect the solvency of existing banks. The examiner, Mr. Williams, alluded to this, but, under close questioning on this point, refused to state unequivocally that it was his opinion that insolvency would result to existing banks or the proposed bank by reason of the opening of the latter. On the other hand, respondent's witness Giltner, experienced in banking and finance, stated that respondent would be a successful and prosperous institution; that both appellant and respondent would do well and prosper, and that other banks in south Kansas City would not be affected. Witness Green likewise related his opinion that respondent could be a successful operation notwithstanding appellant. Witness Corbett, an experienced suburban banker, testified that respondent would be a profitable institution after only a short period of operation, and that it would not adversely affect appellant's solvency. And Mr. Bates, Commissioner of Finance, specifically stated that he did not think that the establishment of the proposed bank would adversely affect the solvency of appellant.

Appellant's main contention is that the Board's decision was based upon hearsay testimony. The record shows that at the outset of the hearing the Board's lawyer member, Hon. Lou C. Lozier, former Commissioner of the Supreme Court, made this announcement: that such testimony would be admitted, subject to objection, and that later the Board would go through the record, and, based upon the rulings of its law member, reject such testimony. A study of the transcript has convinced us that the hearsay evidence present in the record may be completely disregarded, and yet the weight of the competent evidence remains in favor of the Board's ruling.

The judgment of the Circuit Court should be affirmed. It is so ordered.

All concur.