**CENTRAL BANK OF CLAYTON,**
Plaintiff-Appellant,
and
**Duane Pemberton, Commissioner of Division of Finance, State of Missouri,**
Defendant-Appellant,

v.

**STATE BANKING BOARD OF MISSOURI**
et al., Defendants-Respondents,
and
**Clayton Bank et al., Intervenors-Respondents.**

No. 34959.

Missouri Court of Appeals,
St. Louis District,
Division 2.

March 12, 1974.

Motion for Rehearing or Transfer Denied
April 8, 1974.

Application to Transfer Denied
June 10, 1974.

Godfrey P. Padberg, Lloyd E. Boas, St. Louis, for plaintiff-appellant.

Charles A. Blackmar, St. Louis, for defendant-appellant.

Richard E. McFadin, North Kansas City, Robert F. Schlafly, John T. Murphy, Jr., St. Louis, Albert A. Michenfelder, Jr., A.

H. Hamel, Clayton, for intervenors-re-spondents.

McMILLIAN, Judge.

This litigation grows out of an attempt to establish a new bank in downtown Clayton, Missouri, the commercial and governmental hub of St. Louis County and an area now served by several banking institutions. Plaintiff-Appellant, the Central Bank of Clayton (Central Bank), which has proposed the new bank, and Defendant-Appellant, the Commissioner of the Division of Finance of the State of Missouri (the Commissioner), appeal from an order of the Circuit Court of St. Louis County, affirming in part and reversing in part an order of Defendant-Respondent, the State Banking Board of Missouri (the Board). Also parties to the appeal are Intervenors-Respondents, the Clayton Bank, St. Louis County National Bank, and the First National Bank of Clayton, existing banks in downtown Clayton, and the Missouri Independent Bankers Association. The last-named party is interested solely in the question whether a multi-bank holding company violates Missouri statutes prohibiting branch banking.[1]

In October, 1971, five persons filed articles of agreement for the incorporation of a new bank, to be known as the Central Bank of Clayton and to be located in a new office building in Clayton, with the Commissioner. All five incorporators were and are officers of the Bank of St. Louis, a downtown City of St. Louis bank, and of the General Bancshares Corporation, a registered holding company which owns the Bank of St. Louis. The incorporators apparently have an agreement to transfer ownership of the stock of the proposed bank to General Bancshares upon receipt of a charter from the Commissioner.

Following the application for a bank charter, the Commissioner ordered an investigation, pursuant to § 362.030, RSMo 1969, V.A.M.S., into the capital and management of the proposed bank, and into the convenience and needs of the community and the effects of the proposed bank on existing banks in the community. After a two month investigation, the Commissioner found that "all the requirements of Sections 362.020; 362.025 and 362.030 RSMo [V.A.M.S.] have been met," and on February 28, 1972, issued a charter for the proposed bank. The Commissioner's decision was made ex parte, without a contested hearing, but he did include in his record letters from officers of existing Clayton banks objecting to the proposed bank.

Intervenors-Respondents, the existing Clayton banks, joined by the Trust Company of St. Louis County (which is not a party to this appeal), then appealed the decision of the Commissioner to the Board. Two notices of appeal were filed with the Board. Both recited that the convenience and needs of the community would not justify the granting of a new bank charter, but neither raised the issue of branch banking and multi-bank holding companies.

The Board held a hearing on the appeal of April 5, 1972, at which the existing banks and the proponents of the new bank presented voluminous evidence relating to "the convenience and needs of the community to be served" by the new bank. Three expert witnesses testified, and two submitted reports, directed to that issue. In addition, the Board received the Commissioner's investigation and report into evidence. Midway through the hearing, the expert witness for the existing banks, in a "slip of the tongue," referred to the proposed bank as a "branch" of the Bank of St. Louis. Later, counsel for the existing banks ques-

---

1. Sec. 362.105, RSMo 1969, V.A.M.S., provides, in part, that: " . . . [N]o bank or trust company shall maintain in this state a branch bank or trust company, or receive deposits or pay checks except in its own banking house or as provided in section 362.107."

Sec. 362.107, RSMo 1969, V.A.M.S., places severe restrictions on the establishment of separate banking facilities. Other applicable sections are §§ 362.170, 362.415 and 362.425, RSMo 1969, V.A.M.S.

tioned witnesses for the proposed bank about the nature of the agreement by the incorporators to sell their stock in the new bank to General Bancshares. The chairman of the Board also asked questions directed to this issue.

On May 1, 1972, the Board issued a brief order revoking the charter of the Central Bank of Clayton. The findings of fact and conclusions of law were as follows:

"1. That the record and evidence adduced by applicant does not support a finding that the convenience and needs of the community to be served justify and warrant the issue of a charter to the applicant Central Bank of Clayton. There was no evidence adduced by any public witness to indicate or show public need for the proposed bank and the examiner's report of the investigation of the proposed charter fails to disclose any complaint or inadequacy with presently authorized banking services, or more than a token neeα for the proposed bank.

"2. That the Board further finds and concludes that the application by officers or agents of a bank holding company and their express agreement to sell all shares of stock, except qualifying shares, to said holding company upon receiving the charter is contrary to the intent and express restrictions against branch banking and other prohibitions contained in Sections 362.105; 362.107; 362.170; 362.415; 362.420 and 362.425, RSMo 1969 [V.A.M.S.] as amended."

A petition to review the decision of the Board was filed with the St. Louis County Circuit Court on May 10, 1972. After a hearing and submission of the entire record into evidence, the court found that the Board's first finding—that the convenience and needs of the community did not justify the granting of a new bank charter —was supported by competent and substantial evidence on the record as a whole. However, the court reversed the second finding of the Board—that the proposed

bank plan was contrary to Missouri branch banking laws—on the ground that this finding was not supported by competent and substantial evidence. An appeal from the judgment of the Circuit Court was taken to this court by the Central Bank and the Commissioner, and this opinion follows a rehearing of several issues presented by the case.

Since we are asked to determine whether there is "competent and substantial evidence upon the whole record" to support the Board's findings, Missouri Administrative Procedure Act, § 536.140 RSMo 1969, V.A.M.S., we will precis the evidence presented to the Board.

Evidence presented by appellants, the Central Bank and the Commissioner, showed that the City of Clayton has experienced dramatic growth since 1960 and may soon rival downtown St. Louis as the regional commercial and financial center. Since 1959, when the last bank was chartered in the Clayton downtown area, thirteen high-rise buildings and sixteen medium and low-rise buildings have been built there. Clayton office space has grown from 1.3 million square feet in 1959 to 3.7 million square feet in 1971, and was estimated to climb to 4.4 million square feet in 1972. Further, 102 of the nation's 500 largest industrial corporations listed by Fortune Magazine have one or more divisions in Clayton, and twenty-five of the fifty largest insurance firms have offices there. It was estimated that two percent of the nation's effective buying power is concentrated in Clayton.

Appellants' evidence bearing more directly on the banking business showed that total bank deposits in Clayton grew from $95.4 million in 1959 to $280 million in 1971. Between 1966 and 1970, all existing banks in the Clayton area experienced a deposit growth rate of fifty-four percent, or 13.6 percent a year. In the single year between 1970 and 1971, deposits in the three existing banks, Respondents, grew approximately seventeen percent (St. Louis County National Bank), twenty percent (Clayton

Bank), and thirty percent (First National Bank). Using these growth statistics, the senior examiner for the Commissioner estimated that the new bank would capture $9.25 million in deposits in its first year of operation, $15.5 million in its second, and $21.5 in its third. The examiner also estimated that the new bank would show a profit from its second year of operation. His estimates were supported by deposit projections made by another expert witness and by the Federal Deposit Insurance Corporation. It was stipulated that the establishment of the new bank would not affect the solvency of the existing banks. The examiner further testified that the new bank would be convenient both to the residents of Clayton and to persons who work in Clayton but live elsewhere (a work force estimated at 35,000–40,000 people). The proposed location for the new bank is in the immediate downtown area of Clayton, within two and one half blocks of the three existing banks.

In opposing the new bank, Respondents, the three existing banks in Clayton, presented a report and testimony by an expert witness. To measure "convenience," respondents' expert employed what is called "isochronal analysis" of the Clayton area. This analysis is based on measurement of automobile driving time/distances to determine what area will be served by the new bank; the analysis is grounded in an assumption that the volume of business a new bank attracts will vary proportionately with the amount of driving time customers must expend to reach the new bank. The expert found, not surprisingly, that the "isochron," or area within five minutes driving time, of the new bank was overlapped by isochrons of at least three, and in some places four, other existing banks. The expert concluded that the Clayton area was saturated with adequate banking services offered by the existing banks, and that the new bank would add little or nothing to public convenience since seventy-five percent of the people in the area could reach four or five other banks within four or five minutes driving time.

To determine the "need" for a new bank, respondents' expert studied various economic and demographic statistics. He determined that the Clayton area was a predominantly residential neighborhood whose population and household growth rates had matured, that the residents of the area were largely upper-income families whose average age was increasing, and that the area lacked a major shopping center. The expert admitted that he did not consider the amount of growth in office space in the Clayton area and that he probably underestimated the size of the daytime work force in downtown Clayton. (The expert did estimate that about fifty percent of the persons who worked in Clayton also banked there, regardless of their household residence.) Assuming that the need for a new bank depended upon the growth of the number of households in the surrounding area compared with the growth of existing banks, the expert concluded that the existing banks were growing faster than the determinants of need for banking services, i. e., the number of residential households. The expert concluded further that: (1) the new bank would have to attract deposits from areas served by existing banks; (2) the new bank represented a definite threat to the growth rate of the existing banks; (3) establishment of the new bank would *not* impair the profits of the existing banks but would result in increased promotional activity with no gain to the public; and (4) the new bank could threaten the ability of the largest Clayton bank, St. Louis County National (Respondent), to compete among the larger banks in the St. Louis metropolitan area if the new bank was able to compete effectively for deposits in the Clayton area.

Respondents' expert estimated that the new bank would accumulate $3.8 million in deposits in its first year of operation, $5.8 million in the second, and $6.7 million in the third. In his report, the expert estimated the new bank would achieve profitable operations within two or three years, but in testimony before the Board he changed his mind and said that he did not

think the new bank would prosper. He did not cite statistics to support this changed estimate.

Respondents' first point on appeal is jurisdictional. Respondents argue that the Board's order terminated that corporate existence of the Central Bank and that the bank is therefore not a "person" capable of invoking the jurisdiction of the Circuit Court for review of the Board's order. Respondents contend that the five incorporators of the Central Bank are the aggrieved persons and real parties in interest in this case and they must bring the appeal. This point is without merit.

The Missouri Constitution, Art. V, § 22, V.A.M.S., guarantees judicial review of "[a]ll final decisions, findings, rules and orders of any administrative officer or body existing under the constitution or by law . . ." which affects private rights. The Board's order in this case was a final decision which affected the private rights of the corporation, the Central Bank, and not the personal rights of the incorporators. The Board does not have the authority, in revoking the proposed bank's charter, to extinguish the bank's legal capacity to appeal the Board's decision. To accept such an argument would defeat the very purpose of Art. V, § 22 of the Constitution and § 361.094(2), RSMo 1969, V.A.M.S. The Central Bank is the proper plaintiff-appellant to appeal the decision of the Board revoking its charter.

We turn now to the questions raised in light of the central and underlying issue in this case, that of competition in the banking industry. We must consider what value of Constitution and laws placed on competition, under what circumstances and for what reasons can competition be stifled by regulation for the public good, and what type of evidence will justify interference with competition by regulation for a good reason. In responding to these considerations, we have concluded that: (1) the Board erred in its interpretation of § 362.-030, RSMo 1969, V.A.M.S. relating to whether "[T]he convenience and needs of the community to be served justify and warrant the opening of the bank or trust company therein[2] . . . " and (2) there is not substantial and competent evidence upon the whole record to support the Board's finding concerning the convenience and needs of the community. With respect to the Board's finding on the branch banking-holding company question, we have concluded that the Board lacked jurisdiction to decide that issue.

The threshold difficulty encountered in this case is ascertaining the meaning of the statutory requirement that the Commissioner examine whether " . . . [T]he convenience and needs of the community to be served justify and warrant the opening of the bank or trust company therein . . . " (Emphasis supplied.) § 362.030, RSMo 1969, V.A.M.S., before he issues a new bank charter. This case has itself shown

2. Section 362.030, RSMo 1969, V.A.M.S., provides, in part, that: "1. When any bank or trust company has filed with the commissioner proper copies of its articles of agreement, paid all incorporation and other fees in full, as required by law, and provided the cash required by law, the commissioner, before the bank or trust company shall complete its incorporation, shall cause an examination to be made to ascertain whether the requisite capital of the bank or trust company has been subscribed in good faith and paid in actual cash and is ready for use in the transaction of business of the proposed bank or trust company, and whether the character, responsibility and general fitness of the persons named in the articles of agreement are such as to command confidence and warrant belief that the business of the proposed corporation will be conducted honestly and efficiently in accordance with the intent and purpose of this chapter; and if the convenience and needs of the community to be served justify and warrant the opening of the bank or trust company therein, and if the probable volume of business in such locality is sufficient to insure and maintain the solvency of the new bank or trust company and the solvency of the then existing banks and trust companies in the locality, without endangering the safety of any bank or trust company in the locality as a place of deposit of public and private moneys."

several possible interpretations of this portion of chartering act. The Board, in its order, apparently took the view that "need" should be read in an absolute sense. The expert witness for respondents sought to measure "convenience" by driving time/distances, and saw in the words "needs of the community" a public duty to protect the growth rate and competitive positions of existing banks. The bank examiner, on the other hand, eschewed any attempt at precise definition and thought that "convenience" lay largely in the eye of the beholder.[3]

It is not possible to give effect to the legislative intent expressed in this statute by construing "the convenience and needs of the community" in light of the plain and ordinary meaning of the words. Mashak v. Poelker, 367 S.W.2d 625, 626 (Mo. banc 1963). The words themselves speak of "nebulous concepts." Bank of New Bern v. Wachovia Bank & Trust Co., N.A., 353 F.Supp. 643, 647 (E.D.N.C.1972). This statute is on its face written in vague and abstract language, and it will not suffice to say, as respondents suggest, that the legislature intended that the Board give precise meaning to the statutory working. Where words in a statute are on their face so abstract as to lack any limitation, as here, such an interpretation of legislative intent would give the Board the powers of roving commission, free in each particular case to pick and choose from among possibly endless categories of issues and evidence.

In Missouri Pacific Railroad Co. v. Morris, 345 S.W.2d 52, 57 (Mo. banc 1961),

our Supreme Court addressed the problem of vague statutory language.

" 'When the language of an act appears on its face to have a meaning, but it is impossible to give it any precise or intelligible application in the circumstances under which it was intended to operate it is simply void; for if no judicial certainty can be settled upon as to its meaning, courts are not at liberty to supply the deficiency or make the statute certain. But legislation cannot be nullified on the ground of uncertainty, if susceptible of any reasonable construction that will support it.' 26 Am. and Eng. Ency. Law, 2d Ed., 656."

■ It is our judicial duty, then, if possible, to construe this provision of the chartering act to give it reasonable meaning in light of the legislative intent. We must seek to place some reasonable limits on the meaning of the concept of "the convenience and needs of the community." To do so, we must apply the ordinary processes of construction, inquiring into the circumstances and usages of the time when the statute was passed and considering the words in light of objects sought to be obtained and the evils sought to be remedied. Playboy Club, Inc. v. Myers, 431 S.W.2d 228 (Mo.1968); In re Tompkins' Estate, 341 S.W.2d 866 (Mo.1960); Stewart v. Johnson, 398 S.W.2d 850 (Mo.1960) and St. Louis Southwestern Railway Co. v. Loeb, 318 S.W.2d 246 (Mo. banc 1958).

■ The provision requiring an examination into "the convenience and needs of

3. C. f. McCulloch v. Maryland, 4 Wheat. 316, 17 U.S. 316, 4 L.Ed. 579 (1819), where the court addressed a similar problem: "Is it true, that this is the sense in which the word 'necessary' is always used? Does it always import an absolute physical necessity, so strong that one thing, to which another may be termed necessary, cannot exist without that other? We think it does not. If reference be had to its use, in the common affairs of the world, or in approved authors, we find that it frequently imports no more than that one thing is convenient, or useful, or essential to another . . . Such is the character of

human language, that no word conveys to the mind, in all situations, one single definite idea . . . The word 'necessary' is of this description. It has not a fixed character peculiar to itself. It admits of all degrees of comparison; and is often connected with other words, which increase or diminish the impression the mind receives of the urgency it imports . . . This word, then, like others, is used in various senses; and, *in its construction, the subject, the context, the intention of the person using them, are all to be taken into view.*" (Emphasis added.)

the community" was added to the bank chartering act, § 362.030, RSMo 1969, V.A.M.S., by the Banking Act of 1941. Laws 1941, pp. 670, 674. This provision has been construed only once before by a Missouri court, in Suburban Bank of Kansas City v. Jackson County State Bank, 330 S.W.2d 183, 187 (Mo.App.1959), where the Kansas City Court of Appeals said that: ". . . [T]he purpose . . . is not to prevent new banks from entering the field, but rather to insure the existence of a healthy banking system . . . ." See also Marshfield Community Bank v. State Banking Board, 496 S.W.2d 17 (Mo.App. 1973).

Even a brief inquiry into the history of the provision bears out the Kansas City Court's observation. While there is nothing on the record that informs us of the legislative history of this specific amendment to the chartering act, it can and should be considered as a part of the spate of banking legislation passed during and after the Great Depression. See Townsend, "History of Missouri Banking Legislation," 18 Vernon's Annotated Missouri Statutes 321, 360–367 (1949) (hereinafter cited as Townsend). The principal concern with banking legislation during this period was protection of the public and the economy from the effects of bank failures.[4] In Missouri alone, six hundred banks failed between 1920 and 1932, compared with thirty failures in the previous twenty years. In addition, twenty-six banks underwent voluntary liquidations, and there were 198 bank mergers. See Townsend, supra, at 360. On the national level, the calamity in the banking business was equally great. By one estimate, five thousand banks crashed between 1929 and 1933, wiping out nine million savings accounts. Leuchtenburg, Franklin D. Roos-

evelt and the New Deal 18 (1963) (hereinafter cited as Leuchtenburg). Further discussion of the dimension of the general economic collapse associated with the Depression and the banking crises is unnecessary, since the history of this period has been exhaustively probed by historians and is still a poignant memory to many citizens.

In attempting to pinpoint the cause of the Depression, legislators, business and political leaders and scholars formulated many theories. Some felt, for example, that the nation and the economy had matured to the point that future growth would be negligible, while others thought the capitalist system of the economy was no longer workable. Most people, however, had a continuing faith in the nation's free enterprise economy, but felt that the Depression was the result of irresponsible business and economic practices. Bankers in particular were often singled out as scapegoats. As a result of this continued faith in capitalism, federal and state legislation stressed government-business cooperation in an effort to rebuild a free enterprise economy. See Leuchtenburg, supra, at 18–62.

In the banking business, the most general view was that bank failures were the result of excessive competition among banks and imprudent banking practices. See Stokes, "Public Convenience and Advantage in Applications for New Banks and Branches," 74 Banking L.J. 921, 922–23 (1957); and Kreps, "Modernizing Banking Regulation," 31 Law and Contemporary Problems 648, 651 (1966). To correct this supposed imbalance, remedies on the federal level included establishment of the Federal Deposit Insurance Corporation to protect depositors,[5] strengthening regulation

---

4. See e. g., Morey v. Doud, 354 U.S. 457, 469, 77 S.Ct. 1344, 1 L.Ed.2d 1485 (1957); see also Davis, "Banking Regulation Today: A Banker's View," 31 Law and Contemporary Problems 639 (1966); Kreps, "Modernizing Banking Regulation," Id. at 648; and Samuelson, Economics, 2d Ed., 323 et seq. (1951).

5. Compare Weir v. United States, 92 F.2d 634, 636 (7th Cir. 1937), holding that Congress created the Federal Deposit Insurance Corp. "[T]o promote the soundness of banking . . . Its obvious intent was, by securing deposits, to prevent runs on banks by

of national banks,[6] and changes in the Federal Reserve System. On the state level, legislatures moved to give their bank regulatory agencies more power to oversee banking operations and to restrict the right of entry into the existing banking business. Laws of this latter type, allowing restriction of new bank entry, were passed in all forty-eight states, requiring some demonstration of a public need for new banks and an indication for prospects of successful operations without impairing the operation of existing banks.[7]

The first law of this type passed in Missouri was a 1927 amendment to the chartering act, which required the Commissioner to ascertain whether the probable volume of business of location of the new bank was sufficient to insure and maintain the solvency of the new bank and any existing banks. Laws 1927, p. 217. In State ex rel. Bank of Nashua v. Holt, 348 Mo. 982, 156 S.W.2d 708, 711 (Mo.1941), the court held that this amendment gave the Commissioner discretionary authority to restrict competition where it was necessary to protect the public by ensuring bank solvency. (The court in that case also held that the "convenience and needs of the community" amendment of 1941 broadened the Commissioner's discretion in this respect. Supra, 156 S.W.2d at 712.)

This brief historical review, coupled with judicial precedents discussed below, leads us to two conclusions. First, with regard to the depository functions performed by banks, the objectives sought to be obtained by enactment of the "convenience and needs of the community" amendment to the bank chartering act are rather

narrow. The plain purpose of the amendment is to *protect the public* against *excessive* competition in the local banking business and against imprudent banking business practices, where either of these conditions could lead to bank failures or unsafe banking. The goal is a healthy banking system. The amendment does not contemplate preventing new banks from entering a market because existing banks are rendering adequate service. Suburban Bank of Kansas City v. Jackson County State Bank, supra, 330 S.W.2d at 187; Stokes, "Public Convenience and Advantage in Applications for New Banks and Branches," 74 Banking Law Journal 921, 929 (1957). The primary protection afforded by the amendment is extended to the public, not to existing banks. But since the banking business is inextricably intertwined with the general economy, and thus the public welfare, there is an indirect protection provided to existing banks—to the extent that the public is protected from bank failures, so are the existing banks. It is within these limits that the words "convenience and needs of the community" are used concerning bank depository functions, and within these limits the Commissioner or Board has the discretionary authority to restrict competition.

Our second conclusion concerns banking functions other than receiving deposits and paying checks—namely, the lending and other related credit services performed by banks. It is in this area that the issue of competition comes into sharper focus, particularly in view of the mushrooming expansion of the nation's consumer credit market.[8]

depositors, to preserve solvency of insured banks, and thus to keep open the channels of trade and commercial exchange . . ."

6. Compare Deitrick v. Greaney, 309 U.S. 190, 195, 60 S.Ct. 480, 482, 84 L.Ed. 694 (1940), construing a provision of the National Banking Act, 12 U.S.C.A. § 21 et seq. (1970): "[t]he obvious purpose of prohibiting the purchase by a bank of its own stock is to prevent the impairment of its capital resources and the consequent injury to its creditors in the event of insolvency . . ."

7. For a compilation of these laws, see Note, "Bank Charter, Branching, Holding Company and Merger Laws: Competition Frustrated," 71 Yale Law Journal 502, 510–511, Notes 72–88 (1962).

8. C. f. Brimmer, "Market Structure, Public Convenience and the Regulation of Bank Mergers," 86 Banking Law Journal 773 (1969); and Kreps, "Modernizing Banking Regulation," 31 Law and Contemporary Problems 648 (1966).

In construing the "convenience and needs of the community" amendment as it pertains to these other functions, history again provides guidelines. We find it significant that even in the shadow of the Great Depression, the 1941 amendment was enacted against a background of continued faith in a competitive, free-enterprise form of economy. The legislature might have attempted to cure some of the ills of the Depression by subjecting banks to total state control, but it did not. It might have permitted regulated banking monopolies, but it did not. Rather, the legislative and national policy was to continue with an economy where private enterprises could compete among themselves for the attentions of the consumers, and where this competition would provide the public with the best possible goods and services at the lowest possible cost. The court in the *Suburban Bank* case took note of this policy when it noted that the purpose of convenience and needs enactments was not to deter competition and foster monoply. ". . . Too strict a monopoly in the banking field is regarded as being as undesirable as having an excessive number of banks . . ." Supra, 330 S.W.2d at 187.

■ This view of the "convenience and needs of the community" amendment is consistent with the policies implied in the Missouri Constitution, Art. 3, § 44, which provides that:

"No law shall be valid fixing rates of interest or return for the loan or use of money, or the service or other charges made or imposed in connection therewith, for any particular group or class engaged in lending money. The rates of interest fixed by law shall be applicable generally and to all lenders without regard to the type or classification of their business."

This Constitutional provision, even though passed after enactment of the 1941 chartering amendment, is binding on our construction of that amendment. State ex rel. Heppe v. Zilafro, 206 S.W.2d 496 (Mo. 1947). We agree with the sponsor of this Constitutional provision that, "[t]he purpose of Section 44 of Article III was to develop a competitive situation in the lender field . . ." McReynolds, "Legislative Remedies Possible under the Missouri Constitution of 1945," 16 Mo.L.Rev. 292, 318 (1951).

Further, our construction is consonant with federal policy on competition in the banking industry. The Bank Holding Company Act, 12 U.S.C.A. § 1841 et seq. (1969), as Amended, (Supp.1973), prohibits the Federal Reserve Board from approving any bank acquisition, merger or consolidation which would result in monopoly or would lessen competition in the banking business, ". . . [U]nless it finds that the anticompetitive effects of the proposed transactions are clearly outweighed in the public interest . . ." 12 U.S.C.A. § 1842(c) (1969). This statute has been construed by the Supreme Court, in United States v. First City National Bank of Houston, 386 U.S. 361, 87 S.Ct. 1088, 18 L.Ed.2d 151 (1967), to promote competition and prevent monopoly in the banking business. See also Senate Rpt. No. 1179, 89th Cong., 2d Sess. (1966), 1966 U.S.Code Cong. & Admin. News, pp. 2385, 2386.

We conclude, therefore, that with regard to lending and other credit functions. of banks, the purpose of the "convenience and needs of the community" amendment of the bank chartering act is to promote competition in the public interest among banks, to favor bank entry which will stimulate that competition consonant with prudent banking practices and bank safety, and to discourage monopoly in the lending field. The protection afforded by the amendment in this regard is again extended to the public. The goal is to provide the public, where possible, with a reasonable number of local borrowing and credit alternatives so that competition for the public's business, the greatest possible efficiency in the banking business, and economic benefit to the public will result. It follows that the

Commissioner or Board may, under the limitations stated in our first conclusion above, restrict competition to promote banking safety, but failing to find conditions endangering such safety, they must permit and promote healthy competition.

Our conclusions today stressing both bank safety and competition in the construction of the "convenience and needs of the community" provision of the bank chartering bank are not unique. In Suburban Bank of Kansas City v. Jackson County State Bank, cited and quoted numerous times above, the court stressed the importance both of protecting the public from imprudent and unsafe banking practices and of promoting healthy competition.

In State ex rel Dybdal v. State Securities Commission, 145 Minn. 221, 176 N.W. 759, 760 (1920), the Minnesota Supreme Court construed a "reasonable public demand" chartering provision similar to our 1941 chartering provision, and held that:

". . . It (the statute) does not intend that one or more established banks may keep out another because the banking facilities sufficiently take care of the banking business. Its purpose is not to deter competition or foster monopoly, but to guard the public and public interests against imprudent banking."

The Michigan Supreme Court quoted the holding above with approval in Moran v. Nelson, 322 Mich. 230, 33 N.W.2d 772, 778 (1948), and ordered a bank charter to issue even though the area to be served by the new bank was served by several well-established banks. Drawing from Chief Justice Marshall's opinion in McCulloch v. Maryland, 4 Wheat 316, 17 U.S. 316, 4 L.Ed. 579 (1819), that court also rejected, as do we, a reading of "need" or "necessity" in the absolute sense.[9]

Dealing with the same issues, the New Jersey Supreme Court in Application of Howard Savings Inst. of Newark, 32 N.J. 29, 159 A.2d 113, 124 (1959), held that:

". . . [B]ut absolute public necessity for further facilities is not essential. The public should always be entitled to increased interest rates and greater services and convenience which proper competition may well bring. Mere sufficiency of existing facilities in the sense of some existing banking facilities, more or less appropriately located in an area and furnishing the usual gamut of services, is not in and of itself sufficient basis to deny establishment of a new institution or branch if the general economy of the area and its reasonable potential are such that there is room for a further installation without causing excessive competition with real harm to any institution or unduly affecting the banking structure at large . . ."

Similarly, in Wall v. Fenner, 76 S.D. 252, 76 N.W.2d 722, 726 (1956), the South Dakota court rejected the view that ". . . because there are adequate (existing) banking facilities that public convenience and necessity justifying another bank cannot exist," and said: "If such were the case the statute would tend to deter competition and foster a monopoly . . ." See also, Banking Board v. Turner Industrial Bank, 165 Colo. 147, 437 P.2d 531 (Colo.1968); Wilmington Savings Fund Society v. Green, 300 A.2d 227 (Del.Super.1972); First Federal Sav. & Loan Ass'n v. Department of Banking, 188 Neb. 215, 196 N.W.2d 105 (1972); Application of State Bank of Plainfield, 61 N.J. Super. 150, 160 A.2d 299 (1960); and Chimney Rock National Bank of Houston v. State Banking Board, 376 S.W.2d 595 (Tex.Civ.App.1964).

Having delineated the purposes of the "convenience and needs of the community" bank chartering act provision, we turn now to the question of the type of evidence to be considered by an administrative agency in applying the statute. The question becomes—what evidence is probative on "the convenience and needs of the

---

9. See Footnote 3, supra.

community"? We conclude that it is within the discretionary authority of the Commissioner and the Board, in their expert judgment, to decide what evidence is probative to the convenience and needs of a community, so long as the issues of fact and law are shaped in accordance with the purposes and limitations on the statutory language set out above and so long as the evidence is probative on these issues. The decisions of the Commissioner and Board are, of course, subject to judicial review under the applicable statutes.

As both appellants and respondents have pointed out, precedent provides some suggestions of types of evidence which are relevant to convenience and needs. Thus in the *Suburban Bank* case, supra, the court pointed out that:

> "One good indication of whether or not the convenience and needs of the community to be served justify the respondent bank is the amount of deposits which the proposed bank would obtain during the first years of its operation. If the deposits and accompanying business of the bank are substantial, then the bank meets the convenience of the community and there is need for the bank." 330 S.W.2d at 187.

Since the size of future deposits can only be estimated, the agency may want to hear other evidence; for example, facts bearing on the credibility and bases for deposit estimates. Numerous additional evidentiary considerations are suggested in Stokes, "Public Convenience and Advantage in Applications for New Banks and Branches," 74 Banking Law Journal 921, 928–941 (1957). And, we note that a Congressional survey of state banking supervisors in 1951 found that prospects for profitable operations of a new bank were the most widely emphasized evidentiary determinants of need and convenience. The same survey found that lack of prospects for profitable operations was the most common ground for rejection of bank charter applications. Senate Document No. 123, 82d Congress, 2d Sess., Pt. 2, 989, 995 (1952). See also Marshfield Community Bank v. State Banking Board, supra.

The forms of evidence suggested above relate largely to depository functions of banks. In evaluating the lending and credit functions of banks in light of the "convenience and needs of the community" provision, we would suggest an examination into the impact of a new bank on the economy of the community to be served, the number of lending alternatives available to small business and consumer borrowers, the actual competition among existing banks in the lending area, and whether credit is readily available within reasonable bound to all sectors of the local economy.[10]

We turn now to the question whether the evidence and findings in the instant case are probative to "the convenience and needs of the community," as we have construed its meaning. Considering first the Board's express findings, we have already concluded that "need" is not used in this statutory provision in an absolute sense, as the Board uses it, but is related to the history and objectives of the statute. There is no requirement in the statute that public witnesses produce evidence showing need for a new bank or complaint with existing banks.[11] These considerations are

---

10. Where there are but a few banks in an urban community, the extent of actual bank competition and the number of real alternative credit opportunities becomes particularly relevant to new businesses, expanding small businesses, and persons of modest incomes. If these groups are denied credit because the existing banks do not need their business and classify them as marginal or unacceptable risks, then the competitiveness and growth of the economy of the entire community is lessened. C. f. Note, "Bank Charter, Branching, Holding Company and Merger Laws: Competition Frustrated," 71 Yale L.J. 502, 503–504 (1962). The problem is perhaps particularly acute for persons with modest incomes who wish to obtain bank credit cards, a burgeoning source of credit in our present economy.

11. The implication of the Board's finding that no "public witness" was produced to give evidence of banking needs is that "public witnesses" must be so produced. There being

not within the ambit of the bank chartering act as we have construed it, and the Board erred in interpreting the statute to require such evidence.

■ Secondly, we must consider evidence produced at the hearing which supports the Board's position. Again we find serious misinterpretations of the meanings of community need and convenience. Thus, as we have defined these statutory terms, it is simply not relevant to the purposes of the statute, explained above, that in this case the proposed bank would add little or nothing to the driving convenience of people in Clayton. Nor is it relevant that the new bank might, in competing for deposits, affect the growth rate of existing banks or draw deposits from an area already served by several existing banks. Nor is it relevant that banks in the area might choose to increase their promotional efforts because of entry of the new bank. This is in the very nature of healthy competition. In sum, we hold that none of this evidence is, in the context of this case, relevant to a finding that the convenience and needs of the community would not justify the opening of the new bank.

■ In reviewing on evidentiary grounds the decisions of administrative agencies such as the Board, where a hearing is required by law, courts are limited to an inquiry into whether those decisions "are supported by competent and substantial evidence upon the whole record." Constitution, Art. V, § 22 (1945); 536.-140 RSMo 1969, V.A.M.S. This quantum of evidence has been interpreted to mean evidence, which, if true, would have a probative force on the issues. State ex rel Rice v. Public Service Comm'n, 359 Mo. 109, 220 S.W.2d 61, 64 (1949). It has also been described as

". . . [E]vidence favoring facts which are such that reasonable men may

differ as to whether it establishes them; it is evidence from which the trier or triers of the fact reasonably could find the issues in harmony therewith; it is evidence of a character sufficiently substantial to warrant the trier of facts in finding from it the facts, to establish which the evidence was introduced." Collins v. Division of Welfare, 364 Mo. 1032, 270 S.W.2d 817, 820 (1954).

Further, courts are admonished to view the evidence in the light most favorable to the decision of the administrative tribunal, giving that decision the benefit of all reasonable inferences to be derived from the evidence produced. Edwards v. Firemen's Retirement System, 410 S.W.2d 560, 567 (Mo.App.1966).

In Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 488–489, 71 S.Ct. 456, 95 L.Ed. 456 (1951), Justice Frankfurter stated the judicial problem with the substantial evidence test, succinctly:

". . . A formula for judicial review of administrative action may afford grounds for certitude but cannot assure certainty of application. Some scope for judicial discretion in applying the formula can be avoided only by falsifying the actual process of judging or by using the formula as an instrument of futile casuistry. It cannot be too often repeated that judges are not automata. The ultimate reliance for the fair operation of any standard is a judiciary of high competence and character and the constant play of an informed professional critique upon its work.

"Since the precise way in which courts interfere with agency findings cannot be imprisoned within any form of words, new formulas attempting to rephrase the old are not likely to be more helpful than the old. There are no talismanic words

no statutory requirement to produce public witnesses, nor any Board regulation requiring or advising use of these witnesses, the finding raises serious constitutional questions

of unfair surprise and the consequent denial of due process of law. But our disposition of this case makes consideration of the constitutional issue unnecessary.

that can avoid the process of judgment. The difficulty is that we cannot escape, in relation to this problem, the use of undefined defining terms."

The judicial task in this case is made somewhat easier because we have already found erroneous, within the statutory meaning of community convenience and needs, the Board's conclusions of law concerning the lack of any "public witness" or complaint with existing banking facilities. We have also found irrelevant, within the meaning of the statute, some of the evidence produced by respondents which supports the Board's order, particularly that evidence which shows that entry of a new bank will impair the growth rate of existing banks, or will not add driving time convenience to the Clayton banking market, or will result in increased promotional costs for existing banks.

There remains, however, evidence presented by respondents' expert which does fall within the statutory meaning of community convenience and needs and which could support the Board's finding recited in Paragraph No. 1 of its order. We are concerned particularly with the expert's conclusions that: (1) deposits in existing banks are growing faster than the determinants of need for banking facilities; (2) the new bank will probably not be successful; and (3) entry of a new bank could threaten the ability of the largest existing Clayton bank to compete among banks of its size in the entire metropolitan area.

To arrive at his first conclusion, respondents' expert measured various demographic statistics and found that the population and household growth rate in the Clayton area was quite low. He also found that retail sales in that area were off considerably. Pointing then to the 13.6 percent average annual growth rate of deposits in existing banks, he concluded that the growth rate of banks was outstripping the growth rate of needs for banking facilities. Of itself, this evidence might provide support for an administrative finding against entry of a new bank. However, the constitutional requirement that we consider the evidence "upon the whole record" means that we must take into account whatever in the record fairly detracts from the substantiality of the evidence. Universal Camera Corp. v. National Labor Relations Board, supra. The record in this case discloses serious faults in the reasoning employed by respondents' expert. First, by his own admission, the expert failed to consider in his analysis the rather dramatic growth of the Clayton area as an office and commercial services community. To measure commercial activity, he analyzed statistics dealing with retail sales and industrial employment only. And second, also by his own admission, the expert used daytime employment figures for Clayton (8,600) which were substantially lower than those furnished by approved commercial reporting agencies (35–40,000). The expert's employment figures were based solely on a poll answered by only a minority of those sampled.

The expert's conclusion, then, is an opinion based on an apparent discrepancy between two sets of statistical facts, the growth rate of bank deposits and the growth rate of households, population and retail sales; but, the omission of other facts clouds the discrepancy. In sum, we cannot find that this opinion is competent and substantial evidence upon which to rest the Board's finding in Paragraph No. 1 of its order, relating to community convenience and needs.

The expert's second conclusion, that the new bank would probably not be successful, was given in testimony and contradicts the same expert's earlier opinion given in his report. It is also contradicted by other expert testimony, and is unsupported by any facts. It cannot be substantial evidence within the meaning of the constitution and statute.

Respondents expert's last theory—that entry of a new bank could threaten the largest Clayton bank's competitive position in the metropolitan area—is ingenious. In

effect, he is asking the Board to restrict competition on one level (Clayton) to improve competition on another (the St. Louis Metropolitan Area). Whatever, the merits of this robbing Peter to pay Paul theory within the meaning of community convenience and needs, we need not pass on it, for this theory is unsubstantiated by any facts concerning banking competition on the metropolitan level. Furthermore, it is noteworthy that the largest Clayton bank now controls over 32 percent of all deposits in the Clayton area, compared with only 12 percent for its nearest competitor. This bank is hardly in need of the additional competitive edge supplied by the restrictive new bank entry.

We hold, therefore, that a review of the whole record in this case shows that there is not competent and substantial evidence to support a Board finding which inhibits lawful competition in the Clayton banking market.[12]

The final point on this appeal raises the question whether the organization of a new bank, with an accompanying agreement by the incorporators to transfer control of the new bank to a multi-bank holding company, violates state restrictions against branch banking.[13] Respondents urge that the Board's findings on this issue in Paragraph No. 2 of its order, holding that such an organization is a violation of state branch banking laws, is supported by competent and substantial evidence and therefore should be sustained.

■ The facts bearing on this issue are not in dispute. For the purposes of administrative review, the issue is one of law, and not fact, as respondents contend. A

court on appeal of an administrative determination of a question of law is not bound by the substantial evidence test. § 536.140, RSMo 1969, V.A.M.S.; Gordon v. Puritan Chemical Co., 406 S.W.2d 822 (Mo.App. 1966). Nonetheless, the Circuit Court below found that the Board's decision on this issue was not supported by competent and substantial evidence upon the whole record. We agree with the Circuit Court that the Board should be reversed on this point, but we have different reasons. We have determined that on the record of this case the Board lacked jurisdiction to decide whether the attempted incorporation of Central Bank by officers of General Bancshares, where those officers have agreed to transfer controlling interest in the new bank to the holding company in the future, would violate Missouri branch banking laws.

The requirement that fair notice be given in administrative cases is expressly defined by Missouri statutes. § 361.094, RSMo 1969, V.A.M.S., covering appeals to the Banking Board from decisions of the Commissioner of Finance, states that, ". . . [t]he application shall state the grounds upon which it is alleged that the action of the commissioner should be stayed, reversed or altered." Similar notice is required by § 536.063, RSMo. 1969, V.A.M.S., the Missouri Administrative Procedure Act, and that same section provides that, "[r]easonable opportunity shall be given for the preparation and presentation of evidence bearing on any issue raised or decided . . ."

■ While there are no Missouri cases decided directly on the notice requirement

---

12. While not raised as an issue on this appeal, the Board's order in this case is woefully uninformative. The Missouri Bar Committee on Administrative Law has commented recently that, "the character and quality of findings of fact and conclusions of law being issued by some Missouri Administrative Agencies leave much to be desired from the standpoint of the reviewing court and practicing attorneys." 29 J.Mo.Bar 563 (1973). The Board's order here falls with-

in that description. Section 536.090, RSMo 1969, V.A.M.S., requires the agency decisions in contested cases include separately stated findings of fact and conclusions of law, as well as ". . . *a concise statement of the findings on which the agency bases its order.*" (Emphasis added.) See Iron County v. State Tax Commission, 480 S.W.2d 65 (Mo.1972).

13. See Footnote 1, supra.

in administrative cases, the Nebraska court in Block v. Lincoln Telephone & Telegraph Co., 170 Neb. 531, 103 N.W.2d 312, 317 (1960), held that "[i]n order that an administrative hearing be fair, there must be adequate notice of the issues, and the issues must be clearly defined." And, in North Federal Sav. & L. Ass'n of Chicago v. Becker, 24 Ill.2d 514, 182 N.E.2d 155, 158 (1962), the Illinois court said that an administrative officer could not receive evidence or argument on issues submitted by one party without fair notice to the other parties. See also, Schyman v. Department of Registration & Education, 9 Ill.App. 504, 133 N.E.2d 551, 554 (1956). Further, in State ex rel. Police Retirement System of City of St. Louis v. Murphy, 359 Mo. 854, 224 S.W.2d 68, 72–73 (1949), our court held that where an administrative agency's decision affects private rights, and where the benefits in question are not mere gratuities from the agency, the agency may not deny a person those rights without due process of law. The right involved in this case—that of engaging in a lawful business—is a private right, albeit subject to regulation. State ex rel. Rouveyrol v. Donnelly, 365 Mo. 686, 285 S.W. 2d 669, 674 (1956); Banking Board v. Turner Industrial Bank, 165 Colo. 147, 437 P.2d 531, 534 (1968). This right cannot be denied without observance of the fundamentals of due process of law, of which fair notice is one.

There is nothing on the record of this case to show that appellant, the Central Bank, was given fair notice that the contemplated association with General Bancshares was an issue to be tried at the hearing before the Board or was grounds for denial of a charter. The branch banking-holding company question was not mentioned in the existing banks' application to the Board for review of the Commissioner's decision granting the charter. Nor was the question even raised in the opening statement by counsel for the existing bank. The issue was raised peripherally, if at all, by a "slip of the tongue" by a witness for the existing banks. On this basis, it cannot be said that appellant was given "[r]easonable opportunity . . . for the preparation and presentation of evidence bearing on any issue raised or decided . . ." § 536.063, RSMo 1969,[14] V.A.M.S.

Since the statutory requirement that the grounds relied upon in an application to the Board for reversal of the Commissioner's decision were not complied with, we hold that the Board did not have the issue of branch banking and holding companies properly before it. The Board therefore was without jurisdiction to decide the case on that issue, and its findings recited in Paragraph No. 2 of its order, are void.[15]

Even if fair notice of the branch banking issue had been given in this case,

14. Under § 536.063, RSMo 1969, V.A.M.S., a party to an administrative hearing may waive the right to notice ". . . [w]here issues are tried without objection or by consent . . ." but this case does not fall within that exception. The issue of branch banking was neither "tried" nor identified as the basis for denial of the charter application. Further, counsel for appellant did object to presentation of this issue without notice. The evidence shows little beyond the fact that the incorporators of Central Bank had agreed to transfer a controlling interest in the bank to General Bancshares at some future date. The evidence also showed that the existing Clayton banks, intervenors-respondents, are presently holding company owned. Evidence was not produced which would show that a "unified operation" would result from the acquisition of Central Bank by General Bancshares. See Commercial National Bank of Little Rock v. Board of Governors, 451 F.2d 86 (8th Cir. 1971).

15. Our ruling in this regard is not meant to imply that pleadings in administrative cases are bound by the same strict requirements as those in court proceedings. It is considered a virtue of the administrative process that the rules of pleading are informal. The purpose of administrative pleading is simply to let each party know the other's position so that each can properly prepare. The object is to avoid unfair surprise. A generalized summary of the case that affords fair notice of the issues to be tried is all that is necessary. Davis, Administrative Law Text, § 8.02, 196, 197 (3rd ed., 1972), and cases cited therein.

it appears that, as a matter of federal law, the Board lacked jurisdiction to determine in a bank chartering procedure whether a new bank's proposed acquisition by a bank holding company was in violation of state law. In pressing this point, appellants have referred us to the National Bank Holding Company Act, 12 U.S.C.A. § 1841 et seq. (1969), as Amended (Supp.1973), and the Supreme Court's ruling in Whitney National Bank v. Bank of New Orleans & Trust Co., 379 U.S. 411, 85 S.Ct. 551, 13 L.Ed.2d 386 (1965).

The Bank Holding Company Act establishes a comprehensive scheme of regulation of bank holding companies by the Federal Reserve Board. Under the act, no bank holding company can acquire ownership or control of any bank, new or existing, state or national, without prior approval of the Federal Reserve Board. 12 U.S.C.A. § 1842(a) (1969), as Amended (Supp.1973). The act sets up a complete system of administrative control by the Federal Reserve Board of any applications by a bank holding company to acquire a bank. The precedure provides that the Federal Reserve Board shall solicit recommendations on proposed holding company acquisitions from the United States Comptroller of Currency if the bank to be acquired is a national bank, or from the state bank supervising agency if the bank to be acquired is a state bank. Thus, if a holding company wishes too acquire a state bank, as in the case before us, the act contemplates that the holding company will apply for approval of the acquisition to the Federal Reserve Board. That Board will give notice of the intended acquisition to the state agency and allow the agency to submit its views and recommendations. Upon receiving these recommendations and after a hearing on the application, at which interested persons may participate, the act gives the Federal Reserve Board the power to grant or deny the application. 12 U.S.C.A. § 1842(b) (1969), as Amended (Supp. 1973). The Federal Reserve Board's determinations are subject to judicial review in the United States court of appeals, 12 U.S.C.A. § 1848 (1969).

The question raised by appellants here is whether the procedure outlined above vests exclusive jurisdiction of holding company acquisitions of state banks in the Federal Reserve Board, or whether state supervisory agencies retain concurrent or separate jurisdiction over these acquisitions.

In Whitney National Bank v. Bank of New Orleans & Trust Co., supra, the court held that the Bank Holding Company Act gave exclusive jurisdiction to the Federal Reserve Board to act in cases of bank holding company arrangements and that statutory proceedings before that Board were the sole means by which questions as to the organization or operation of a new bank by a holding company could be tested. Further, the court said that opponents of a holding company acquisition of a new bank could attack the arrangement only before the Federal Reserve Board and that the Board's decisions were reviewable only in the United States courts of appeal. Supra, 379 U.S. at 419–423, 85 S.Ct. at 551.

It is true that the *Whitney* case involved the proposed acquisition of a national bank, not a state bank. The scheme was for the original parent bank, a national bank, to become a subsidiary of the holding company, and for the holding company to acquire the new bank, also a national bank, which was located in another parish (county). The plan was attacked both as a violation of a Louisiana statute prohibiting holding company acquisitions and as a violation of the state's branch banking laws.

But despite the national bank aspect of the *Whitney* case, its implications are that its ruling applies to the situation before us now; that is, the acquisition of a state bank. As the *Whitney* court pointed out, the thrust of the opponents' argument was not the chartering of a new bank, but a vi-

olation of law, if any, that would occur when the new bank was acquired by the holding company. Supra, 379 U.S. at 418, 85 S.Ct. at 551. This acquisition could be approved only by the Federal Reserve Board, and hence was a matter for that agency's determination. In light of the procedures established by the act, the same point can be made about the instant case.

Further, the language of both the federal statute and the *Whitney* case indicates that the exclusive jurisdiction of the Federal Reserve Board exists whether or not a national or state bank acquisition is drawn into question. It should be noted that throughout the *Whitney* opinion, Mr. Justice Clark made no differentiation between national and state bank acquisitions. He also rejected the notion that the Board's determinations could be attacked collaterally before the Comptroller, commenting that: "A rejection of this doctrine here would result in unnecessary duplication and conflicting litigation . . . " Supra, 379 U.S. at 422, 85 S.Ct. at 558. By analogy, the same logic applies here, and the Federal Reserve Board's determinations may not be challenged collaterally before the state banking agency.

This latter position has been adopted by the Maine Supreme Court in Nealley v. Brown, 284 A.2d 480 (Me.1971), where the court considered, in a lengthy opinion, the same question as we have before us; that is, the acquisition of a state bank or trust company by a bank holding company. That court distinguished between the roles played by the state chartering authority and the Federal Reserve Board, and drawing from the rationale of *Whitney*, held that the state bank commissioner lacked jurisdiction to determine, at a chartering procedure, whether granting the charter would result in branch banking:

"[T]he Bank Commissioner lacked jurisdiction, because of the impact of the Federal Bank Holding Company Act, to act as he did by making a *final* decision grounded on factors intimately involved in the total relationship of bank holding companies to banking corporations which they own, or control—i. e., whether 'chain' or 'bank holding company affiliated' banking is involved rather than 'branch' banking." Supra, 284 A.2d at 490.

In a footnote, the court noted that its emphasis was on the bank commissioner's attempt to make a *final* decision denying the charter. The court said that if the commissioner believed that a violation of state branch banking laws would result, he should grant the charter but include a warning that he would oppose the holding company plan before the Federal Reserve Board. Supra, 284 A.2d at 490, Note 4.

While both the *Whitney* case and Nealley v. Brown are clear in holding that the Federal Reserve Board has the exclusive jurisdiction to make an initial determination whether a holding company acquisition plan violates state laws, neither case directly answers the more difficult question. That question is: if the Federal Reserve Board grants an application for acquisition of a state bank by a holding company, does the state banking agency then have the power to disapprove the plan as a violation of state law? 12 U.S.C.A. § 1846 (1969) provides that the Bank Holding Company Act " . . . shall not be construed as preventing any State from exercising such powers and jurisdiction which it now has or may hereafter have . . . " Therefore, the problem is indeed troubling, but we need not reach the issue here.

In conclusion, we find that the trial court erred in sustaining Finding Number One of the State Banking Board since that Order was not supported by competent and substantial evidence on the whole record. We further find that the trial court reached the right result in reversing the Board as to its Finding Number Two, but

for a wrong reason. Accordingly, we affirm in part and reverse in part the judgment of the trial court with directions. The trial court is directed to set aside and hold for naught its affirmance of the Board's Finding Number One; and to enter a new judgment in accordance with the views expressed herein. The trial court is further directed to dismiss the Board's Finding Number Two for the reason that the Board lacked jurisdiction to decide the case on that issue. Finally, the charter granted to the Central Bank of Clayton by the Commissioner of the Division of Finance is hereby reinstated.

DOWD, C. J., CLEMENS, KELLY, SIMEONE and GUNN, JJ., and JAMES H. KEET, Jr., Special Judge, concur.