Raymond E. GLASNAPP et
al., Appellants,

v.

STATE BANKING BOARD et
al., Respondents.

No. KCD 27806.

Missouri Court of Appeals,
Kansas City District.

Dec. 27, 1976.

Jeremian D. Finnegan, Lem T. Jones, Jr., Jones & Schaumburg, Kansas City, for appellants.

Irven L. Friedhoff, Tony K. Vollers, Jefferson City, for respondent State Banking Bd.

Rodger J. Walsh, Robert C. Barry, Kansas City, for respondent Grandview Bank and Trust Co.

Robert W. Spangler, Harrisonville, for respondents E. P. Schug, Cass County Bank, J. Weldon Jackson and Citizens Bank of Belton.

Jack C. Terry, James L. Swarts, Independence, for respondents Bank of Belton and Frank Blair, Jr., Pres.

Before DIXON, P. J., PRITCHARD, C. J., and WASSERSTROM, J.

WASSERSTROM, Judge.

Appellants applied to the Commissioner of Finance for a charter for a bank to be opened in Raymore, Missouri. The Commissioner denied the application, from which action appellants appealed to the State Banking Board. After a contested hearing, the Board issued its order affirming the Commissioner, from which appellants sought judicial review in the Circuit Court of Jackson County under Sections 361.095(4) and 536.100. (All statutory references are to RSMo 1969.) The Circuit Court affirmed the order of denial, from which ruling appellants take the present appeal. We affirm.

The town of Raymore in which the proposed bank was to be located lies in northern Cass County, south of Kansas City. According to the 1970 census, Raymore counted a population of only 587. In 1972, the town increased its physical size from 306 acres to 8505 acres by annexation, the purpose being to forestall expansion into that area by Kansas City. Partly as a result of that annexation and partly as a result of general population growth in Cass County, the population of incorporated Raymore increased by 1973 to a figure variously estimated to be between 1,600 and 2,500.

The town has approximately 50 business establishments, mostly small service operations. There is however no central business district and there are no national merchandisers, no clothing store, no drug store, no motor car dealer and no high school.

A large percentage of the incorporated town, as well as most of the immediately surrounding trade area, consists of undeveloped agricultural land. The area is frequently described in the evidence as a bedroom community for Kansas City and this characteristic has brought some home building. At the time of the hearing before the Commissioner and that before the Board, building activity had slowed down because of general business conditions. Home building in Raymore is also handicapped by very limited sewer system and water supply.

Raymore finds itself ringed on all sides by a number of much more developed communities, offering among other business facilities a total of nine existing banks within a 12 mile radius of the location of the proposed Raymore bank. Two of those banks are located in Belton, 4½ miles to the west; one is located in Peculiar, 5½ miles to the south; one is located in Grandview, 8 miles to the northwest; 3 are located in Lee's Summit, 8½ miles to the northeast; one is located in Hickman Mills, 9 miles to the northwest; and one is located in Pleasant Hill, 11.7 miles to the east.

■ Of appellants' points on appeal, their Point No. I reads: "The purpose of the State Banking Board in considering applications for new bank charters is not to prevent new banks from entering the field, but rather to insure the existence of a healthy banking system." This abstract statement flatly violates Rule 84.04(d) and presents nothing for review. *Strake v. R. J. Reynolds Tobacco Co.*, 539 S.W.2d 715 (Mo.App. 1976); *Stokes v. Kelly*, 537 S.W.2d 562 (Mo.App.1976); *Dors v. Wulff*, 522 S.W.2d 325 (Mo.App.1975).

The other points made by appellants, in summarized form, are that the trial court erred in affirming the decision of the Board because: 1) the Board failed to make findings; 2) the Board applied legally impermissible standards; 3) the Board's findings are not supported by the evidence; and 4) the Board failed to consider benefits which would accrue from increase in banking competition. Each of those points will be discussed in order, after disposition has first been made of points raised by two of the respondents.

I.

■ Grandview Bank and Trust Co., which intervened before the Board in opposition to the application and which now has appeared and filed brief as respondent in this court, challenges the jurisdiction of the circuit court of the petition to review and of

this court on appeal, taking the position that the incorporators of the proposed bank are not proper parties and that the petition for review to the circuit court and the appeal to this court should have been taken by the proposed bank. Proceeding on this premise, Grandview further denies that venue lies in Jackson County. In support, Grandview cites *Central Bank of Clayton v. State Banking Board of Missouri*, 509 S.W.2d 175, l. c. 181 (Mo.App.1974) in which it was held that the bank, rather than its incorporators, was the aggrieved party, the real party in interest and the one entitled to bring the appeal.

*Central Bank of Clayton* is not in point. There, the Commissioner issued a charter for the proposed bank and it was only upon appeal to the State Banking Board that the Board revoked the charter. The *Central Bank of Clayton* opinion holds only that, "[t]he Board does not have the authority, in revoking the proposed bank's charter, to extinguish the bank's legal capacity to appeal the Board's decision."

In contrast to the situation in *Central Bank of Clayton*, here the Commissioner did not issue a charter and the proposed Bank of Raymore never came into existence. Under the express provisions of § 362.040, the ones entitled and authorized to appeal from that denial by the Commissioner were the incorporators. By logical extension, when the Board affirmed the Commissioner's denial, the incorporators were the parties aggrieved entitled to file a petition for judicial review and to pursue an appeal from the decision adverse to them by the circuit court. One of those incorporators resides in Jackson County, which confers venue in the trial court.

## II.

■ Bank of Belton, which also intervened before the Board in opposition to the application and appears in this court as a respondent, has moved to dismiss this appeal on the ground that appellants' brief fails to contain a fair and concise statement of facts and fails to contain a proper state-ment of points relied upon, all in violation of Rule 84.04. This motion is well taken insofar as it relates to appellants' point relied upon No. I, and as already noted in this opinion, that point will not be considered. In other respects, however, appellants' brief is not so violative of the Rule as to call for the drastic action sought. The motion to dismiss is therefore denied.

## III.

■ Appellants attack the sufficiency of the Board's findings, relying heavily on *Century State Bank v. State Banking Board of Missouri*, 523 S.W.2d 856 (Mo.App. 1975) in which this court reversed and remanded an order of the State Banking Board because of the Board's failure to make proper findings of fact. In *Century State Bank,* the findings consisted essentially of conclusory facts in the form of the statutory language. Such meager content as appeared in those findings other than the statutory conclusion tended to indicate that the Board had reached its determination on an improper basis. The *Century State Bank* opinion points out that § 536.090 requires that the findings of fact "shall include a concise statement of the findings on which the agency bases its order" and emphasized the duty of the agency "to make a determination as to what part of the evidence it will believe and find to be true and what part it will reject."

The findings here do meet the standards of adequacy prescribed in *Century State Bank.* Section 362.030 requires among other criteria for the issuance of a new bank charter, a determination "if the convenience and needs of the community to be served justify and warrant the opening of the bank or trust company therein, and if the probable volume of business in such locality is sufficient to insure and maintain the solvency of the new bank." Section 362.040 repeats the same requirement. The Board determined that the quoted requirement was not met in this case, and paragraphs 5 and 7 of its order contain specific findings to that effect in the statutory language.

However, the Board did not stop with the statement of those conclusory statements of ultimate fact. The two parts of the criterion in question are closely interrelated (as will be more fully described under Point IV A of this opinion) and the requirement as a whole focuses on the question of the financial prospects of the new bank for survival and profitability. The parties and the Commissioner's staff all agreed that the answer to that question depended upon inquiry into the following subsidiary issues: 1) what was the appropriate trade area (known in banking parlance as "the primary service area") from which the new bank could be expected to draw the bulk of its business; and 2) the probable volume of deposits which could reasonably be expected by the new bank from that area. The parties submitted voluminous testimony, maps and statistical material all directed toward these subsidiary issues.

Responding to the issues so formulated, the Board proceeded to make direct subsidiary findings of fact on those matters. By paragraph 6(c) of its findings the Board made its choice between the conflicting evidence as to what constituted the appropriate primary service area. Then the balance of paragraph 6 addressed the question of the amount of potential deposits and found in understandable factual terms why the Board deemed the prospects insufficient for profitable operation by the proposed bank.[1]

■ The findings of paragraph 6 do not descend into evidentiary detail, but that generally speaking is not required for the validity of administrative findings. In this respect, *Iron County v. State Tax Commission*, 480 S.W.2d 65, l. c. 69 (Mo.1972) holds:

"'Courts do not want agencies to include detailed summaries of testimony in their findings; they want what they call the

1. Paragraphs 5, 6 and 7 of the Board's Findings are as follows:

"5. Based on the record before the Board taken as a whole the Board finds:

(a) Within the area to be served by the Bank there is presently no need for a bank and no convenience would be served by a bank.

(b) The probable volume of business for the proposed bank is insufficient to assure its solvency.

6. The Board, based on the record as a whole, further finds the following facts support its Findings in paragraph 5:

(a) The proposed bank would depend primarily on the area surrounding the bank for business and this area has insufficient population and too few and too small business establishments to support a bank at present.

(b) Projections as to the future growth and development of the Raymore area are not sufficiently predictable to find that a bank will be needed in the Raymore area in the future. The future development of the Raymore area will depend upon factors for [sic] which cannot be accurately projected at the present time, including but not limited to:

(i) The ability of the community to construct sewers and sewer treatment facilities;

(ii) The ability of developers to attract financing;

(iii) Economic conditions which make the purchase of new homes attractive to families.

(c) The capital of the proposed bank will consist of capital of $150,000.00, surplus of $75,000.00 and undivided profits of $75,000.00. The maximum amount that the proposed bank may loan to any individual or business under

Missouri law would be $56,250.00. Such capitalization:

(i) Prevents the bank from financing significant development in the area without the assistance of other banks which would depend upon individual decisions of such other banks beyond the control of the proposed new bank;

(ii) Is insufficient to protect the bank against potential losses and, therefore, the safety and solvency of the proposed bank is endangered.

(d) The amount of deposits that the proposed bank will attract during the first three years of its operation is insubstantial and is unlikely to exceed $1,800,000.00 under the most favorable circumstances.

(e) A reasonable service area for the bank is delineated by census tract 603 since traffic patterns, the lack of significant retail and service establishments in Raymore and the proximity of neighboring banks makes it unlikely that individuals and businesses outside this area will find it convenient to travel to Raymore to conduct business.

7. The Board finds that the Commissioner and Intervenors have affirmably established that the proposed bank would not serve the needs and convenience of its community and that the probable volume of business of the proposed bank is insufficient to insure and maintain its solvency; and that the proponents of proposed bank have failed to establish any competent and substantial evidence based on the record as a whole that the bank would serve the public need and convenience or that its probable volume of business is sufficient to insure and maintain its solvency."

basic facts. * * The basic findings are those on which the ultimate finding rests; the basic findings are more detailed than the ultimate finding but less detailed than a summary of the evidence.' 2 Davis, Administrative Law Treatise, Section 16.06, pages 450, 451. Only when the administrative agency makes such basic findings can a court properly perform its limited function of review of the administrative action. To repeat Judge Hyde's statement in *Michler v. Krey Packing Co.*, 363 Mo. 707, 253 S.W.2d 136, 142, 'In any case, finding should be sufficient to show how the controlling issues have been decided.' "

Just how far the administrative agency must go in setting forth subsidiary facts depends upon the particular case and the issues presented for determination. For this reason it has been held that "[t]he zone of propriety between the extremes of mere conclusion and undue particularity has never been accurately defined. It has been said that all of the essential facts upon which the order is based must be found." *Bryan v. Community State Bank of Bloomington*, 285 Minn. 226, 172 N.W.2d 771, 775 (1969). The overall principle generally subscribed to is summarized in 2 Am.Jur.2d Administrative Law § 455, p. 268, as follows: "The most reasonable and practical standard is to require that findings of fact be sufficiently definite and certain or specific under the circumstances of the particular case to enable the court to review the decision intelligently and ascertain if the facts afford a reasonable basis for the order without resorting to the evidence."

The findings here, considered in the context of the sharply defined issues and in light of the particular record, pass muster under the purposes and tests stated by the foregoing authorities. For example, one of the important and hotly debated factual issues in this case was the population of the primary service area delineated by the Board. (See Point V B2. of this opinion, infra). No specific sub-finding was made as to this population figure, but the following statement in appellants' brief demonstrates that such a sub-finding was unnecessary: "While not stating the population of the PSA in words and figures, it is patently clear that the Board accepted the population figures of the Commissioner." In this regard, therefore, as well as with respect to other evidentiary disputes, the Board's findings leave no doubt as to "what part of the evidence it will believe and find to be true and what part it will reject," which is the test laid down by *Century State Bank.*

## IV.

Appellants challenge the legal standards applied by the Board in denying the charter requested. They say that the Board's findings show on their face a misapprehension by the Board as to the correct legal principles which should have been utilized.

A. *Meaning of "Convenience and Needs."* Appellants attack the Board's making of separate findings as to "the convenience and needs of the community" and the matter of "the solvency of the new bank." They contend that "convenience and needs" constitutes the only ultimate issue to be found, that the separate finding pertaining to "solvency" demonstrated a misunderstanding by the Board of the meaning of § 362.030 and § 362.040, and that the separate finding as to the projected inability of the proposed bank to remain solvent "is not sufficient to salvage the decision."

It is true that *Marshfield Community Bank v. State Banking Board,* 496 S.W.2d 17 (Mo.App.1973) holds that the question of solvency of a proposed new bank is not an independent issue under these statutory sections, but rather the statutory reference to the necessity of assurance as to such solvency is merely an added refinement to the required finding on convenience and needs; and this characterization has been carried forward with approval into the decisions in *Central Bank of Clayton v. State Banking Board of Missouri, supra* ; and *Blue Ridge Bank v. State Banking Board,* 509 S.W.2d 763 (Mo.App.1974). However, appellants' argument grossly exaggerates

the separation of these two elements; in truth they are extricably interrelated, and community convenience and need cannot exist if the proposed bank would in reasonable foreseeability become insolvent.

■ The historical and economic background of the 1941 amendments to the Missouri Banking Statutes, which introduced the statutory requirements now under discussion, has recently been subject to intensive study and scholarly exposition by the opinion in *Central Bank of Clayton v. State Banking Board of Missouri, supra.* That opinion points out that these amendments were part of a legislative wave following the depression to remedy the "irresponsible business and economic practices" which had led to numerous and costly bank failures throughout the country. The legislative change was intended to limit "excessive competition among banks and imprudent banking practices" by restricting the right of entry into the banking field, while at the same time preserving competition and discouraging monopoly in the banking industry. The *Central Bank of Clayton* opinion views the intent of this statutory amendment to be to create a balance between those considerations. Nevertheless, the statute does permit the Banking Board to "restrict competition to promote banking safety." Thus, the *Central Bank of Clayton* opinion demonstrates the necessity that any newly entering bank must be able to show its economic viability as an essential element of its proof that the grant of the charter would serve the convenience and needs of the community.

So also *Blue Ridge Bank v. State Banking Board, supra,* at l. c. 769, recognizes that solvency of the new bank, while not a matter for a disparate finding, is only artificially divisible from the issue of community convenience and need and that such convenience and need cannot exist if bank insolvency would result from the new entry. The same conception is stated even more strongly in the *Marshville Community Bank* opinion in which the court stated in footnote 2 at l. c. 21:

[I]t could hardly be said that a new bank would serve the convenience and needs of its prospective trade territory if its opening endangered the solvency of the area's established banks or uselessly impeded their opportunities for expanded service—*and especially so if its competitive activities were likely to be conducted at risk of its own solvency and hence at hazard to the public.*" (emphasis added). The *Marshfield* opinion further emphasized this same thought in footnote 13 at page 29 of the opinion where it observes:

"If a storekeeper, in an excess of competitive zeal, works himself into bankruptcy, the loss is his; but if a bank fails, the domino reaction to its fall brings the whole community down with it, as those of us who survived the debacle of the Great Depression so well remember."

Even appellants themselves concede that the probabilities of insolvency is something which must be considered by the Board. So, in its brief, it admits: "Whether or not the new bank will fail as a depository is a consideration the Board must take into account in granting or refusing a bank charter. Bank safety is a legitimate concern."

■ On the evidence here, the Board was of the opinion and found "that the probable volume of business of the proposed bank is insufficient to insure and maintain its solvency." Under the above authorities, that finding dictated a consequent conclusion that the entry of the proposed bank would not serve the community convenience and needs.

■ Appellants further argue under this same heading that the Board misapplied the statute by limiting its Findings 5(a) and 6(a) to the *present* needs of the community. The whole impact of this argument is destroyed by reference to Finding No. 7 which contains no reference at all to "present" needs. Moreover, Finding No. 6(d) affirmatively shows that the Board had in mind and fully considered foreseeable developments in the community during the immediately succeeding three year period.

Applicants further argue that the Board improperly regarded the criterion of need "in the absolute sense" which was held to be improper in the *Central Bank of Clayton* opinion. We did not so read the Board's findings. Rather, Finding No. 6(b) and (e), to which applicants object, refer to factors bearing upon the probable volume of deposits which the new bank could expect and therefore was intended to show the basis upon which the Board found that the probable volume would not be sufficient to assure solvency for the proposed bank. These considerations were therefore perfectly proper. The projected amount of deposits and the accompanying banking business also constitute a good indication of community convenience and need. *Suburban Bank of Kansas City v. Jackson County State Bank*, 330 S.W.2d 183 (Mo.App.1959); *Central Bank of Clayton v. State Banking Board of Missouri, supra*. Consideration of factors bearing on the probable volume of deposits in no way conflicted with the holding of *Central Bank of Clayton*.

B. *Materiality of Undercapitalization.* Appellants challenge the materiality of the findings set forth by the Board in its Finding of Fact No. 6(c). It challenges first subparagraph (i) which takes into consideration the fact that the proposed bank's low capitalization will prevent it from making any loan over $56,250, which would foreclose it from financing by itself significant development in the area. In support of this attack, appellants rely on *Central Bank of Clayton* for the proposition stated in its brief that the Board "may not deny a bank charter on grounds related to the area of 'lending and other credit related functions.' "

Appellants read the *Central Bank of Clayton* opinion much too narrowly. That opinion makes it clear that the Board may deny a charter to a new bank which would not likely remain solvent. The low proposed capitalization of the Bank of Raymore would affect its prospects of profitability. Statutory § 362.170 imposes a limitation on any individual loan under the proposed capitalization here so that the

maximum loan could not exceed $56,250. In the current inflationary ambience, that limitation could very well constitute a serious handicap and constituted a legitimate consideration to be taken into account by the Board. Furthermore, this limitation on lending power also serves to restrict the degree to which the proposed bank could serve the community convenience and needs.

Appellants also challenge subparagraph (ii) of Finding No. 6(c), which states that the proposed low capitalization would be insufficient to protect the bank against potential losses. Appellants' theory in this regard is that statutory § 362.050 requires that a bank in a town with a population of less than 5,000 have a capitalization of not less than $50,000. Appellants reason that this gives legislative approval to any capitalization of at least that amount and that the Board has no authority without amendatory legislation to require any amount in excess thereof.

In answer to this argument, it must be observed that the statute requires a capitalization of *"not less than"* $50,000. This creates a floor, not a ceiling, for the capitalization. It is interesting to note that appellants themselves were not satisfied with a mere $50,000 capitalization and they proposed to start with $300,000, or six times the statutory minimum. The Board may also in the interest of bank safety, which as pointed out in the Missouri case law was the primary purpose of the 1941 banking amendments, require additional capitalization. Under a New Hampshire statute (N.H. RSA 392:25) substantially the same as ours, the New Hampshire Supreme Court in *Hanaway v. State,* 352 A.2d 715, 716 (1976) held: "Under the statute the board could reasonably require greater capital where doubt existed regarding the profitability of the proposed trust company." So also the Missouri Banking Board has like power.

### V.

Appellants next launch an attack upon the sufficiency of the evidence to support

certain key findings made by the Board. This attack centers in the first instance upon Finding of Fact No. 6(d). The criticism subdivides into, first, a challenge to the Board's finding that deposits of $1,800,-000 would be insubstantial; and, second, upon that portion of the finding which states that the proposed bank would be unlikely to attract deposits in excess of $1,800,000.

The principles governing and limiting judicial review of administrative decisions have been so well and frequently stated that there remains no reason to restate or attempt to further refine the applicable rules. *Century State Bank v. State Banking Board of Missouri, supra* ; *Blue Ridge Bank v. State Banking Board, supra* ; *Central Bank of Clayton v. State Banking Board of Missouri, supra* ; *Suburban Bank of Kansas City v. Jackson County State Bank, supra* ; *Marshfield Community Bank v. State Banking Board, supra* ; *Broadway National Bank v. Linwood State Bank,* 456 S.W.2d 296 (Mo.1970). In keeping with the doctrine announced by those cases, the findings here under attack will be reviewed to ascertain whether they are supported by competent and substantial evidence upon the whole record, viewing the evidence most favorably to the Board's determination. Also to be kept in mind is that these matters are not capable of exact proof and "fall into the area of educated prediction." *Lemay Bank & Trust Co. v. Oakville Bank & Trust Co.,* 518 S.W.2d 128 (Mo.App.1974).

### A.

*Substantiality of Deposits Amounting to $1,800,000*

Appellants claim that deposits in the sum of $1,800,000 must be considered substantial because they submitted figures as part of their Feasibility Study showing that the new bank would be able to break even financially when deposits reached a point somewhere between $1,650,000 and $1,750,000. They argue that this shows that the bank could be operated profitably with deposits of $1.8 million, so that the

Board was unwarranted in treating that figure as "insubstantial."

Even if the break-even figures submitted were wholly accurate, the $1.8 million deposits hypothesized by the Board would just barely put the new bank into the black. If this represents the best that can be hoped for, the bank would not remain long in existence. As the principal promoter Glasnapp testified, "I wouldn't be in the banking business, or I wouldn't be in the real estate business, if I didn't think that there was an opportunity to make a profit."

Along this line, it must be noted that appellants' Feasibility Study does not rest on the break-even figure mentioned. Rather their three-year financial projection submitted to the Board showed an expectation of total deposits for the third year of $2,837,500. It is this latter figure that the appellants were obviously relying upon in applying for a charter and on the basis of which they hoped to earn a profit from the banking operation. It is this figure which the Board rejected when it found that deposits would be unlikely to exceed $1,800,-000 under the most favorable circumstances.

Moreover, the break-even figure upon which appellants base their present argument is in itself very debatable. Grandview, one of the intervening objecting banks, stated in its formal response before the Board that "if the applicant received 100% of the potential deposits in the PSA, that is $2.5 million, it still would not have enough money to operate in a solvent manner." Thus in the view of this bank, not even $2.5 million (much less $1.8 million) would constitute the minimum break-even point.

That statement by respondent Grandview is further supported in much greater detail by a statistical chart submitted as part of the response of another intervening opponent, Bank of Belton, and which was adopted by respondent Citizens Bank of Belton. That exhibit computes a much greater amount of interest which would have to be paid by the Bank of Raymore on time deposits and a greater loss for bad debts, then

the parallel figures submitted by appellants' Feasibility Study. With these adjustments, even using appellants' projected third year deposits totaling $2,837,500, those opponents compute that the new bank would still be operating at a loss at the end of the third year.

On top of all that, the record shows that all of the other banks in the area have deposits substantially in excess of $1.8 million, and even $2.8 million. The smallest of those banks, the Cass County Bank of Peculiar, Missouri, had deposits as of January 30, 1973, in the amount of $5,543,078.20. That means that the smallest of all the existing banks is operating on deposits far in excess of what appellants submitted as a break-even figure and of its three-year projection, and this tends to support the criticisms levied by the opposing banks against appellants' financial analysis. The Board's finding that $1.8 million would be insubstantial does not conflict with the competent and substantial evidence on the whole record.

### B.

*Sufficiency of the Evidence to Support Projected Amount of Deposits*

 The Board's finding that the amount of deposits the proposed bank would likely attract would not exceed $1.8 million rests upon three basic subsidiary determinations: (1) a delineation of the service area upon which the proposed bank would have to depend primarily for deposits; (2) the population of that area; and (3) the size of deposits which can be expected per family. Each of those three determinations is challenged by appellants.

1. *Delination of the service area.* Appellants aim their initial and heaviest barrage at Finding No. 6(c) which finds a reasonable service area (referred to generally in the record as the "primary service area") for the proposed bank would be that delineated by census tract 603. In contrast to that, appellants argue for a much larger area consisting of a rectangle surrounding Raymore which includes all of census tract 603, 80% of census tract 604 and small portions of census tracts 600 and 602. The

area chosen by the Board excludes the eastern 40% and the western 10% of that tract designated by the applicants, and thereby excludes certain important areas upon which appellants seek to rely, principally Lake Winnebago and the Raintree housing development. This variation in projected service areas is probably the most profound difference between the position of the Board and that of appellants.

Examination of the record shows that the Board's conclusion as to the proper proportions of the primary service area is well supported by the evidence, including maps, aerial photographs, studies of traffic patterns, the location of other banks, and the shopping facilities available. One central theme repeatedly and clearly emerges from the testimony: Raymore is primarily an agricultural area within the trade centers of surrounding communities. The town of Raymore is small, with few businesses of any size or import. It has no stores which are of the type which would draw people to the community to do their shopping and business. Raymore's character as a "bedroom community," in which people live in one place and commute to other places where they are employed, becomes especially important when coupled with the proposition, as expounded by the appellants' own expert, that banking is a convenience service and that a five minute driving time is an established standard for a convenience item, which can be extended to 7 to 8 minutes for dealing with a rural area. In light of the fact that banking is a convenience service, and that few people would be drawn to the Raymore vicinity in the course of shopping, employment or business, it is significant to note that a number of banks are close to the Raymore area and are located in towns which do have shopping centers or business areas. There are two banks in Belton which is approximately 3½ miles from the center of Raymore and approximately 5 minutes away. There are four banks within 10 minutes, including the two Belton banks, the Grandview bank, and the Peculiar bank, and the Pleasant Hill bank is not much further away. The obvious implication of such evidence as this is

that people will want to make one trip instead of two and will bank in those areas where they have to go for other reasons. This possibility is further buttressed by evidence that, other than Highway 58, all the roads in the area of Raymore are gravel roads which are in fair to poor condition. For most of those living in surrounding areas, a trip to the town of Raymore means either a circuitous route, or traveling poor roads.

The traffic patterns in the area bear out the hypothesis that these factors would discourage people from going to Raymore. A Missouri Traffic Volume Study indicates that traffic both to the east and west of Raymore does not move through Raymore as often as it flows away from the center of that town on Highways 71 and 291, which suggests that persons residing, for example, west of Raymore and in Raymore, travel west to Highway 71 to commute to work, trade, and shop. With regard to roads and traffic, one other fact is significant: Highway 71, the major highway artery of the area which runs north to Kansas City, is a limited access highway with interchanges west of Raymore in the town of Belton and south of Raymore in the town of Peculiar. Anyone from Raymore entering Highway 71 must gain access at one of these two points. This is one other factor drawing traffic away from Raymore, but it is also a manmade barrier which makes traveling to Raymore from points west of 71 much less convenient.

The impact of these characteristics was further documented with regard to significant specific areas lying within the primary service area designated by the applicants and outside the primary service area designated by the Board. For example, there was evidence that in Lake Winnebago, which lies northeast of Raymore, there is no identification with the town of Raymore and nothing to draw Lake people to the area. Raymore does not lie on a direct traffic route connecting the Village of Lake Winnebago to an ultimate employment or trade area. It was the opinion of Mr. Jackson, president of the Citizens Bank of Bel-

ton and longtime resident of the area, that the new bank would have few customers in the Lake Winnebago area. Similarly, to get to Raymore from the Raintree development, which lies parallel to Lake Winnebago but further east, one must travel a circuitous 7 mile route—if one is to drive on improved roads—or else take gravel roads which are in fair to poor condition. Furthermore, part of Raintree is in the city limits of Lee's Summit which has established shopping and business areas. Mr. Spangler, representing the Cass County Bank and the Citizens Bank of Belton, testified that *none* of the Big Creek Township, which is census tract 604 (lying directly east of Raymore Township and census tract 603) should be included in the service area because the people of this entire area, which includes Lake Winnebago, have no contacts with Raymore and are as close to Lee's Summit as to Raymore, and would go to Lee's Summit because it lies on a more direct route and because many of these people work in Kansas City and go through Lee's Summit to get there.

There was other evidence that people north of Raymore will not go south to Raymore, but rather north toward Kansas City because this is the area in which they shop and work. For many of the people living east of Raymore there is also another factor which would draw them elsewhere to bank, that being the fact that most of the people living along Highway 291 are farmers and would have occasion to travel to Pleasant Hill, a short distance away, or Harrisonville, which lies on a direct route south on 291, for necessary agricultural goods and services. Evidence as to the characteristics of the town of Raymore, the poor roads and prevailing traffic patterns in the area, the fact that Raymore is in the business and trade areas of surrounding towns where the people of the area currently bank, and evidence as to the nature and tendencies of the outlying areas themselves, taken in a light favorable to the conclusions of the Board, amply support the decision of the Board.

Although appellants did present evidence which would support the validity of the

larger primary service area, this evidence does not undermine that discussed above and does not overwhelm it. Appellants emphasize that two of the intervening banks estimated a larger primary service area for the proposed bank than did the appellants themselves. However, as Mr. Walsh representing the Grandview Bank and Trust Company made clear in his testimony, the large service area was designated not because it was thought that the proposed bank would actually attract a large portion of funds from those areas, but because it would be necessary to draw from such a large area if a charter were to be sustained. It was the opinion of the intervenors that the charter could not be sustained.

The appellants expound upon the methodology for estimating the primary service area, but an examination of the various techniques demonstrates only that any of several results can be reached by emphasizing the facts which lead to the area chosen. The facts discussed above support the Board's estimation of the probable primary service area, and, when coupled with the five theories propounded in appellant's brief, lead inexorably to the conclusion that the Board's delineation was at least reasonable, and in fact the most reasonable area. Reillie's Law, which focuses upon trade areas and shopping facilities, the Vacuum Calculation Technique, emphasizing extant banks and natural barriers, the Isochronal Technique stressing accessibility, and the Intuitive Technique which would rely on the judgment of persons who know the area and who know banking, all militate clearly in favor of the Board's conclusion.

2. *Population of the service area.* After challenging the Board's finding as to the probable primary service area, appellants turn next to an attack on the Board's acceptance of a population estimate of 800 households in census tract 603, the primary service area designated by the Board. In order to arrive at the projection of deposits by the end of the third year, the Board had to work with some type of estimate of the number of accounts which would be opened with the proposed bank and both sides

agreed that the population of the primary service area is a proper base from which to estimate that number of accounts. However, the parties disagree on the population of the area; part of this disagreement is due to the difference in the size of the primary service area, part is due to a disagreement over the demographic facts.

The most recent census of the area was taken in 1970 and both parties recognize that the area has grown since that time. In the hearing before the Board, Mr. Jerry Samp, the supervising investigator of the Department of Finance, arrived at a figure of 800 households by starting with the 1970 census which stated that there were 452 households, and using the figure 800 in order to allow liberally for growth. That figure was the one accepted by the Board.

Samp's estimate of 800 families finds support in testimony given with respect to population counted as individuals. Councilman Pickett, testifying for appellants, estimated the present population of the City of Raymore to be between 2,000 and 2,500 and appellants' witness Goin estimated that figure to be 2,400 or 2,500. There was evidence that 59 farm families lived in census tract 603 around the City of Raymore. Taking these 59 families at an average of 3.29 persons per family (which was a figure accepted by all parties), that yields a total sum of 194 persons living in the census tract outside the City of Raymore. Adding these 194 to the highest estimate made by Pickett and Goin, that gives a total of 2,694. By way of comparison, a multiple of the 800 families estimated by Samp by 3.29 persons yields a total of 2,632, which is quite close to the results of the testimony most favorable to appellants given by their own witnesses.

The competing population figures offered by appellants are 1,858 households for the service area proposed by them or alternatively 1,499 households for Raymore Township less certain exclusions. The 1,858 figure cannot be accepted since it relates to a primary service area substantially larger than that designated as appropriate by the Board. The 1,499 figure must also be re-

jected for the reason that it has not been coordinated to or shown to count an area coinciding with the confines of census tract 603, the service area to be measured.

On the record taken as a whole, the Board's determination of the population within census tract 603 is fairly supported by the evidence.

3. *Size of deposit accounts per family.* The third and final attack of appellants on the $1,800,000 estimate for deposits is mounted upon the Board's projection of the size of accounts which would be deposited with the proposed bank, which is calculated at one $1,000 savings account per family and one $800 checking account per family. Thus, $1,800 in total deposits was assigned to each of the 800 families estimated to be living in the primary service area designated by the Board.[2] An examination of the record reveals sufficient evidence to support the Board's conclusion.

With regard to the proper projection of the size of accounts, the parties introduced conflicting evidence. The Commissioner's staff utilized the figures from the Citizens Bank of Belton which showed a figure of $776 for the average demand account and $866 for the average savings and certificates of deposit per account and rounded these figures up to $800 and $1000 respectively. The Belton figures were employed because the primary service area of the Citizens Bank of Belton encompasses the primary service area projected for the proposed Raymore bank, and, according to the 1970 census, the median income was approximately the same for both areas. The assumption that every household in the census tract would have a demand and a savings account with the Raymore bank was considered by the Commissioner's staff generous because they believed such a high percentage of penetration to be an unrealistic expectation for a new bank. (This assumption of 100% penetration of the market

compares with a penetration of only 15–20% posited by appellants' Feasibility Study.) If anything, the resulting projection therefore was thought by the staff to overstate the potential.

Appellants argue that the Commissioner's figures, which were based on a per account study of one bank, were inaccurate. They undertake to so show by contrasting the Commissioner's computation with the total deposits of all the banks of Cass County, divided by the population of Cass County and thus converted into a per capita figure. Such a per capita figure was calculated to amount to a total of $4,935 per family in Cass County. Such an approach is advocated by appellants on the grounds that it takes into consideration business, public and outside accounts which the per account figure utilized by the Board allegedly omits.

Having determined that Belton was an area comparable to Raymore and thus having made the selection of which figures to use, the Board had no choice but to use a per account figure rather than a per capita figure because the town of Belton has two banks. Furthermore, the per account figure was considered fair because such a figure includes all of the accounts at the Citizens Bank of Belton—taking in business, farm, public and outside deposits. Thus, the amount of the average deposit would incorporate business and other accounts, and this factor coupled with the generosity of the number of accounts assumed was considered to fully cover the impact of such accounts.

In addition to the above evidence which supports the findings of the Board, there was other evidence which undermines the position advocated by the appellants. Use of an average account figure derived from all of the areas in the county is unreliable because there was evidence that the Raymore area has neither the wealth nor the

**2.** Commissioner's Exhibit No. 6, the projection for maximum deposits from the service area, shows a total of $1,440,000, arrived at by multiplying 800 times $1,800. The difference of that total from the $1.8 million figure in Finding of Fact No. 6(d) leaves $360,000 leeway. That,

taken together with the additional leeway arising from the staff's overly generous assumption of 100% penetration of the market, answers appellants' criticism that the Commissioner's formula fails to allow for deposits to be secured from outside the primary service area.

strong business base which are present in other areas of the county. The town of Peculiar is a case in point. Peculiar has a sound business base, is located on and has access to Highway 71, and is the hub of a network of good blacktop roads leading south from the town. Peculiar attracts business from surrounding farm communities because it has a grain elevator, farm supply store, lumber yard and railroad station. Furthermore, the population figure of Peculiar—comparable to that of Raymore on its face—is misleading because Peculiar is surrounded by residential areas which are outside its corporate limit, in contrast to Raymore which is surrounded by sparsely populated areas. The average deposits in the Cass County Bank at Peculiar are therefore not a good basis for prediction of what the experience of a bank in Raymore would be.

Peculiar was not the only area shown to be substantially different from Raymore. The median income and home value figures for Big Creek Township in the 1970 census were substantially above the figures for Raymore. The median value of an owner-occupied housing unit in census tract 604 (Big Creek Township) was $41,700, while the median value of an owner-occupied housing unit in census tract 603 was only $13,000.

The Board's findings in all the respects challenged are supported by substantial evidence on the whole record.

### C.

*Consideration to Lending and Credit Related Services*

For its final thrust, appellants complain that the Board failed to consider the new lending and credit which the proposed bank would bring to the community and the benefit to be secured through this increased competition. It cannot be said that the Board wholly ignored this phase of the matter, as evidenced by Finding of Fact No. 6(c)(i).

However, the fundamental answer to appellants' complaint is that the increased competition offered by a new bank cannot be in the public interest if the competition will be only short lived and soon terminate in a bank failure. That is the plain teaching of the *Central Bank of Clayton* opinion, upon which appellants rely. The Board having concluded on appropriate evidence that the probable volume of business for the proposed bank was insufficient to assure its solvency, that concluded the matter.

The evidence supported the Board's findings and those findings in turn justified the Board's denial of the requested charter. The judgment of the circuit court affirming the Board was correct.

Affirmed.

All concur.