**Herbert J. HEINEN, Appellant,**

v.

**POLICE PERSONNEL BOARD OF JEFFERSON CITY, Respondent.**

**No. WD 54665.**

Missouri Court of Appeals, Western District.

Submitted March 12, 1998.

Decided July 7, 1998.

Motion for Rehearing and/or Transfer to Supreme Court Denied Sept. 1, 1998.

Application for Transfer Denied Oct. 20, 1998.

Mark A. Richardson, Jefferson City, for appellant.

John J. Pawloski, St. Louis, for respondent.

Before EDWIN H. SMITH, P.J., and ELLIS and SMART, JJ.

SMART, Judge.

Herbert Heinen appeals the decision of the Police Personnel Board of Jefferson City, a third-class charter city under § 77.010, RSMo 1994, upholding his dismissal from employment as a police officer. The Circuit Court of Cole County denied his petition for review of the Board's decision. On appeal, Heinen alleges that (1) the Board's decision was not supported by substantial evidence on the record, and (2) he was denied due process during the post-termination hearing in that he was not permitted to cross-examine the chief of the department concerning the chief's prior personnel evaluations. Due to lack of clarity in the Board's decision as to certain crucial facts, we vacate the judgment of the circuit court and remand for new findings of facts and conclusions of law.

## Factual Background

The evidence is reviewed in the light most favorable to the Board's decision. *Shell Oil Co. v. Director of Revenue*, 732 S.W.2d 178, 180 (Mo. banc 1987). Herbert J. Heinen began working for the Jefferson City, Missouri, Police Department in August of 1978. In 1987, Heinen received a promotion to lieutenant. By August of 1996, Heinen was in charge of hiring and testing new officer recruits, baton and firearms training, and training for citizens enrolled in the Citizens Police Academy, a volunteer program sponsored by the department. In addition, Heinen was the department's supply officer. As such, he was responsible for the procurement of law enforcement equipment.

At the end of January, 1996, K. Tyler Brewer became the new Chief of the Jefferson City Police Department. Prior to that, he had been employed by the police department of Wichita, Kansas. Lieutenant Heinen's office was five feet down the hall from Chief Brewer's office, and they had contact many times daily. By all accounts, Lt. Heinen and Chief Brewer had a good working relationship prior to a series of events beginning in August of 1996.

Lt. Heinen received personnel evaluations every six months. Heinen's evaluations were consistently favorable in all areas until his July 1996 evaluation, which noted Heinen's

failure to carry out an order to procure new badges for the officers of the Jefferson City Police Department. Lt. Heinen and Chief Brewer had discussed the idea of procuring new badges for the department months earlier, and the chief instructed Lt. Heinen to contact a supplier and order new badges. The regular supplier informed Heinen that it would be unable to fill the order before the end of the department's fiscal year. After Chief Brewer learned of the supplier's inability to deliver the badges before November, he ordered Lt. Heinen to contact other equipment suppliers about obtaining the badges. Lt. Heinen failed to do so before August 14, 1996, when Chief Brewer went to Lt. Heinen's office to ask him why the new badges had not been ordered and to obtain the supplier's catalogues so that he could personally order new badges.

At this meeting, Chief Brewer asked Lt. Heinen why he had not purchased the badges and asked for the equipment catalogues. Heinen responded by getting up abruptly, pushing his chair back against the wall, and saying, "Because they're not the ones that I [vulgarity] work with." The chief told Lt. Heinen that the problem with the badges would not have happened if he had ordered the badges promptly. After offering some other excuses, Lt. Heinen came around his desk with his fists clenched and accused Brewer of trying to take advantage of the vendor Heinen originally had contacted to deliver the badges. After being told to sit back down, Lt. Heinen refused the order, saying, "I don't have to do [vulgarity]." The chief then explained that he was allowing the vendor to keep the part of the contract he could perform in time while finding another supplier to fulfill the rest of the contract. Lt. Heinen persisted in his accusation that the chief was trying to exploit the original vendor, and added that the chief was a "malicious manipulator." When asked to explain himself, Heinen mentioned an alleged incident involving the chief and another subordinate in the department. Pressed further on the matter, Heinen complained of the way the chief conducted budget meetings and his management style generally. Brewer assured Lt. Heinen that if he had any problems with the way he ran the department he

should express these concerns sooner rather than later, when it would be impossible to address them. Lt. Heinen responded that he did not wish for any more heated confrontations in the future. Brewer left Lt. Heinen's office.

Brewer arranged another meeting with Heinen two days later on August 16, 1996. Brewer also prepared a disciplinary notice in which he cited Lt. Heinen for violating departmental regulations in his failure to order the badges and the confrontation during the meeting on August 14. The meeting on August 16 became, in essence, a pre-disciplinary hearing after Heinen expressed his desire to talk about the earlier confrontation during the scheduled meeting.

After the August 16 meeting, a written reprimand was placed in Lt. Heinen's personnel file. Heinen personally received this reprimand on August 23, 1996. When told by the chief that he could appeal the reprimand, Lt. Heinen shook his head and indicated that he did not wish to do so. Brewer then told Heinen that he planned to forget the incident and move on. Heinen expressed a similar intention to put the incident behind him.

The spirit of reconciliation was to be shortlived. On August 26, 1996, Brewer learned that an anonymous letter criticizing his management of the department was received by a member of the City Council. Brewer learned of the letter from another officer in the department, who related that he had explained to the council member that the allegations contained in the letter were untrue. Brewer then called the City Administrator, Richard Mays, and warned him that an anonymous letter had been sent criticizing Brewer's management of the department. The chief saw a copy of the letter later that day. The letter (which we reproduce in full in Appendix A) accused Chief Brewer of managing the department through manipulation and verbal abuse. For example, the letter stated: "Chief Brewer is a control freak. During his first six months of reign, he has suspended one employee, threatened to fire two employees, and everyone is wondering who is his next target?" The letter

closed: "There is an eerie still air in the police station. Ranking Officers are afraid to voice their ideas and concerns openly because of Chief Brewer's dishonesty. Moreover, I am unable to sign my name for fear of reprisal against my family and me by Chief Brewer." The letter was signed, "A CONCERNED TAXPAYING VOTER." Contained within the letter was a reference to a specific incident that allegedly occurred within the police station, in which the Chief supposedly referred to his own wife as "a loser" after conversing with her on the telephone. The letter also stated that a sexual harassment complaint had been filed against Chief Brewer by another city employee.

Concluding that the letter came from inside the department, Chief Brewer promptly convened a meeting of the command staff to discuss the letter. At this meeting, one of the captains stated that he would no longer feel comfortable in staff meetings if there were an information leak within the command staff. Fearing the letter's effects on trust within the department, Brewer then began an informal investigation into the source of the letter. As part of this investigation, Brewer asked various people within the department if they knew anything about the letter. Due to the recent disciplinary problems involving Lt. Heinen, Heinen was an early suspect. During his informal investigation, Chief Brewer heard from several people that Lt. Heinen had privately claimed to have authored the letter in whole or in part.

The same day that Brewer learned about the letter, Heinen overheard a conversation between two fellow police employees regarding the letter. He was asked by one of the co-workers whether or not it was true that such anonymous letters were simply discarded by previous chiefs. Heinen responded that he did not know first-hand, but that he thought they were. Heinen did not mention that he had any knowledge of or responsibility for the letter.

Chief Brewer first spoke to Lt. Heinen regarding the letter on September 13, 1996. At the outset, the chief gave Lt. Heinen a *Garrity* [1] warning, warning him that any statement he made during the investigation could not be used against him in criminal prosecution, but that failure to answer could result in departmental discipline and that his answers could be used in disciplinary proceedings.[2] The chief emphasized to Heinen that it was imperative for Heinen to tell the truth, and that lying would constitute flagrant insubordination warranting termination. Heinen responded that he understood the consequences. Brewer then told Heinen that he had reliable information that Heinen's wife had written a letter condemning his management style. Brewer also told Heinen that he had information that Heinen had assisted in composing the letter. Heinen vehemently denied that his wife had written any such letter, denied any knowledge of the letter, and assured the chief that his wife would never have written such a letter. A police captain who was also present, Captain Johnson, asked Lt. Heinen if it was possible that his wife had written and sent the letter without Heinen's knowledge. Heinen answered that there was no way that could have happened without Heinen discovering it. Heinen said that he knew nothing about the letter until August 26, 1996, when another officer, Sergeant Bledsoe, mentioned the let-

---

1. A reference to *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967).

2. The warning given to and signed by Heinen read as follows:

Internal Investigation Warning

I wish to advise you that you are being questioned as part of an official investigation of the Police Department. You will be asked questions specifically directed and narrowly related to the performance of your official duties or fitness for office. You are entitled to all the rights and privileges guaranteed by the laws and the Constitution of this state and the Constitution of the United States, including the right not to be compelled to incriminate yourself. I further wish to advise you that if you refuse to testify or to answer questions relating to your performance of official duties or fitness for duty, you will be subject to departmental charges which could result in your dismissal from the Police Department. If you do answer, neither your statements nor any information or evidence which is gained by reason of your statements can be used against you in any subsequent criminal proceeding. However, these statements may be used against you in relation to subsequent departmental charges.

ter to Heinen. Brewer told Heinen that he did not believe his story, and that he would have to resort to other witnesses to substantiate Heinen's responsibility for the letter. He then added that Heinen might be required to submit to a polygraph test. Heinen responded that he would be willing to take such a test, since he was anxious to get to the bottom of the allegations. Heinen was instructed to speak to no one regarding the investigation.

Soon after the meeting, Lt. Heinen entered Chief Brewer's office and asked him if he could speak with the chief alone. Chief Brewer answered that he would prefer to have another witness and offered to call Captain Johnson back. Lt. Heinen said that would be unnecessary and repeated that he had no involvement in or knowledge of the letter. Brewer told Heinen that he would contact Heinen later.

On the morning of the following Monday, September 16, 1996, Heinen walked over to the City Administrator's office to speak with Richard Mays, the City Administrator. Heinen's intention was to confess his knowledge of and responsibility for the letter to Mays before confessing to Brewer, who, Heinen feared, would distort his words in any later proceedings. Mays took notes during the ensuing meeting, which started with an upset and nervous Heinen telling Mays that he had no knowledge of the letter. Mays indicated that he doubted Heinen based upon what he had already heard, specifically that two other people had come forward and told Brewer that Heinen had talked to them about a letter that was sent to the city council. Heinen then stated that his wife had written the letter without his knowledge, and that he did not know that his wife had written the letter until after his September 13, 1996, meeting with Brewer. Mays told Heinen that his second version of events was still not consistent with the information he had received. Offering his advice, Mays suggested to Heinen that he tell the truth. Mays then asked Heinen if he agreed with the allegations contained within the letter. Although he had claimed to have not read the letter, Heinen then stated that he did not agree with the contents except for the last

paragraph, which alleged fear of reprisal for writing the letter. After Mays stressed the importance of telling Chief Brewer the truth about the letter, Lt. Heinen stated that he did have knowledge of the full contents of the letter, but that his wife had sent the letter before he could stop her. Mays concluded the meeting by telling Heinen to tell Chief Brewer what Heinen had just told Mays.

Lt. Heinen met with Chief Brewer in the chief's office later that day. The chief had just been informed by Mays that Heinen intended to speak with him and admit that he had co-authored the letter with his wife. After arriving at Brewer's office, Heinen told the chief that his wife sent the letter without his knowledge and that he did not find out that it had been sent until August 23, when his wife informed him that the letter had been sent. Heinen explained that he was too scared of losing his job to come forward earlier and tell the chief that he had prior knowledge of the letter. Heinen implied that he had been in no way involved in the composition of the letter. Brewer warned Heinen that he had information to the contrary. Heinen then admitted that he helped write the letter, but stated that he never intended the letter to be sent. Given that he had been told by Mays that Heinen planned to confess, Brewer later said he was surprised and dismayed that Heinen's confession of co-authorship had to be extracted from Heinen. Brewer doubted that Heinen had not intended that the letter be sent from the beginning. Brewer asked Heinen more questions regarding when and to whom Heinen had talked about the letter. After discussing the matter with his command staff, Brewer decided to punish Heinen through a temporary reduction in rank. Heinen would be demoted for six months, after which time he would be evaluated, and, if deemed worthy, given his prior rank. Heinen refused to accept this discipline, claiming that his First Amendment free speech rights were entitled to protection. Brewer considered Heinen's reaction a rationalization for what Brewer thought he and Heinen had agreed to be misconduct. Consequently, Chief Brewer told Lt. Heinen that termination was once again a disciplinary option.

On October 4, 1996, the Department terminated Lt. Heinen, effective October 25, 1996. Heinen appealed to the Police Personnel Board. At a hearing on December 2, 1996, Heinen conceded under oath that he had lied to Chief Brewer when he initially told him that he had neither knowledge of nor responsibility for the letter. He also admitted that he assisted in writing a portion of the letter, specifically the part at the end in which the writer used the specter of retaliation to justify the choice to remain anonymous. The Board took the matter under consideration and upheld Heinen's termination in a written opinion dated December 4, 1996. The Board found that Heinen had violated numerous sections of the Police Rules and Regulations by failing to order badges, by ridiculing his superior officer both in the officer's presence and outside his presence, and by deliberately lying to a superior officer after receiving a *Garrity* warning regarding his knowledge of and involvement in the composition of the letter. The Board found that "Heinen failed to conduct himself in a manner that demonstrates good behavior and efficient service when he embarked on a course of conduct of lying and deceit from the period beginning August 26, 1996 and continuing until September 13, 1996, which is in violation of Section 6.3 of the City Charter."

## City Charter Provisions

Section 6.3 of the Jefferson City charter calls for the creation of a merit system within the police department. The same section requires that system conform to certain guidelines with respect to discharge of officers, including the requirement that "[a]ll persons so appointed or promoted shall be entitled to hold office during good behavior and efficient service." The merit system created by § 26–18 of the Municipal Code provides in § 26–21 that "[a]ll persons appointed or promoted to a position in the police department shall be entitled to hold office during their good behavior and efficient service." Section 26–26 permits the chief of police to discharge any member of the department "for misbehavior, inefficiency, neglect of duty or other valid cause" when "the good of the department will be promoted thereby." Section 26–26 provides that discharges must be

justified in writing and that discharged officers may appeal the discharge to the Police Personnel Board for a public hearing, as is required by § 6.3(b)(5) of the city charter.

## Standard of Review

■ In administrative appeals, the appellate court reviews the decision of the agency, not that of the circuit court. *Kendrick v. Board of Police Commrs. of Kansas City,* 945 S.W.2d 649, 651 (Mo.App.1997). When reviewing administrative decisions, the court's task is limited to determining whether the decision was supported by competent and substantial evidence upon the whole record, whether the decision was arbitrary, capricious or unreasonable, or whether the administrative agency abused its discretion. *Evangelical Retirement Homes of Greater St. Louis, Inc. v. State Tax Comm'n,* 669 S.W.2d 548, 552 (Mo. banc 1984); § 536.140, RSMo 1994. "Substantial evidence" is evidence which, if true, has probative force: evidence from which a trier of fact could reasonably find the facts in harmony therewith. *Coastal Mart, Inc. v. Department of Natural Resources,* 933 S.W.2d 947, 951 (Mo. App.1996). We review the evidentiary record in the light most favorable to the administrative decision, giving the decision the benefit of all reasonable inferences from the record. *Shell Oil Co.,* 732 S.W.2d at 180. To present a subject for appellate review, the written decision of the administrative agency must show how the controlling issues have been decided. *Mobil Oil Corp. v. State Tax Comm'n,* 513 S.W.2d 319, 324 (Mo.1974). The extent to which the agency must set forth findings as to subsidiary facts depends on the facts of the case and the issues presented for determination. *Missouri Veterans Home v. Bohrer,* 849 S.W.2d 77, 80 (Mo. App.1993). The agency's findings of fact must be sufficiently specific to enable the court to review the agency's decision intelligently and to determine if the facts provide a reasonable basis for the decision without an independent search of the record by the court. *Glasnapp v. State Banking Bd.,* 545 S.W.2d 382, 387 (Mo.App.1976). The reviewing court is not permitted to presume that the agency found the facts in accordance with

the result reached. *Webb v. Board of Police Commrs. of Kansas City,* 694 S.W.2d 927, 928 (Mo.App.1985).

## The Board's Findings

The Board found that Heinen violated numerous rules and regulations by not ordering the new police badges, in addressing a superior in a profane and offensive manner, in ridiculing a superior officer in and outside the superior's presence, and in his concealment of his knowledge of and responsibility for the letter. The only specific finding with regard to whether Heinen's misconduct was inconsistent with "good behavior and efficient service" was contained in the last section of the Board's findings of fact, § 24: "Heinen failed to conduct himself in a manner that demonstrates good behavior and efficient service when he embarked on a course of conduct of lying and deceit from the period beginning August 26, 1996 and continuing until September 13, 1996, which is in violation of Section 6.3 of the City Charter." The Board made no findings as to whether the failure to order badges and Lt. Heinen's angry use of vulgar language in addressing Chief Brewer were breaches of good behavior and efficient service. The Board's findings that Heinen "ridiculed the management abilities and management decisions of his superior officer in his presence as well as outside his presence" are sufficiently vague that without reference to the record, we would have no idea as to what the Board is referring. Even in looking at the record, we have some doubt as to what the Board means when it writes of ridicule outside of Chief Brewer's presence. We do not know if the

Board was referring to things Lt. Heinen might have told other officers in the department, conversations Heinen might have had with his wife about Chief Brewer, or the contents of the letter sent to the members of the City Council criticizing Brewer. We do not presume the Board found the facts in accordance with the result. *Webb,* 694 S.W.2d at 928. We will take the Board's findings as we find them in the record. Consequently, we will focus exclusively on whether there was substantial evidence of Heinen's misconduct *after* the sending of the letter, the only misconduct specifically cited (in § 24 of the Findings) by the Board as conduct inconsistent with good behavior and efficient service.[3]

Regarding Lt. Heinen's conduct from the sending of the letter up to the point of his questioning as part of the official internal investigation, the Board found in § 18 that "Heinen knew about the existence, content and distribution of the letter prior to August 26, 1996, nevertheless, he willfully failed to disclose his knowledge and participation until confronted on September 13, 1996, which is in violation of Section 14.2.3(A) of the Police Rules and Regulations." Section 14.2.3(A) of the Rules states: "The public demands that the integrity of its law enforcement officers be above reproach, and the dishonesty of a single officer may impair public confidence and cast suspicion upon the entire Department."

## Evidence as to the Finding of Dishonesty

Heinen's own testimony before the Board shows that he knew prior to August 26, 1996,

---

3. On appeal, Heinen asserts his First Amendment rights as to the content of the letter. Although the Board is not a court, and is not capable of adjudicating constitutional issues, such claims should be asserted before the Board so that the Board's findings could reflect whether the content of the letter was a basis for upholding the termination decision, aiding judicial review. In any event, in this case a reasonable reading of the Board's findings show that their decision upholding the termination was based upon Heinen's dishonesty *about* the letter, not on the content of the letter itself. Because we regard the Board's decision as resting on evidence of Heinen's misconduct in obstructing the investigation into the origins of the letter rather than the misconduct in helping write and distribute

the letter, we do not address Heinen's argument that the letter contained speech protected under the First Amendment of the United States Constitution or the argument derived therefrom and that the Board's findings were deficient in that they do not specifically address Heinen's constitutional claims. In any event, Heinen conceded at oral argument that part of the letter [the reference to Heinen's alleged remark about his wife] was not entitled to constitutional protection as not relating to a matter of public concern. For similar reasons we do not address Heinen's argument that his termination violated his fundamental marital rights under the Due Process Clause of the Fourteenth Amendment and that the Board's findings should have included findings pertaining to this claim.

that the letter had been sent to the City Council, and that he knew as early as August 26, 1996, that the same letter had been received by at least one member of the City Council. Equally clear from the record is the fact that Heinen concealed his knowledge of the letter from his superiors until September 16, 1996. However, Heinen was not asked about the letter until September 13, 1996. The word "dishonesty" is undefined by the Department Rules and Regulations. In the absence of a definition within the departmental regulations, we cannot say that Heinen's failure to volunteer his knowledge regarding the letter, even after learning that it had been received, constituted "dishonesty". While it is clear to us that § 14.2.3(A) imposed the duty of candor on Lt. Heinen if he chose to speak, it is not clear to us that the section imposed an affirmative duty on Lt. Heinen to volunteer an acknowledgement of his involvement with the letter. Rather, Heinen's dishonesty consists in his decision to lie about his knowledge of the letter in response to direct questioning by his superiors after they had administered the *Garrity* warning. Therefore, we can find no substantial evidentiary support for the Board's finding that Heinen violated 14.2.3(A) by not volunteering information concerning the letter prior to inquiry.

The Board's only specific finding as to whether Heinen's misconduct constituted a failure to perform with "good behavior and efficient service" under § 6.3 of the city charter cited Heinen's embarkation "on a course of conduct of lying and deceit from the period beginning August 26, 1996 and continuing until September 13, 1996, which is in violation of Section 6.3 of the City Charter." The Board appears to have considered Lt. Heinen's concealment of his knowledge regarding the letter prior to Chief Brewer's inquiry on September 13, 1996, in its finding that Heinen's discharge was supported by cause. Because we have concluded that, contrary to the Board's finding, such concealment did not constitute "dishonesty" under § 14.2.3(A), we cannot logically conclude that Heinen's failure to come forward unbidden prior to the official inquiry was part of a course of "lying and deceit." Although Lt. Heinen, despite a *Garrity* warning, certainly lied to Chief

Brewer in response to direct questioning on September 13, 1996, we cannot say that his responses during that interview constituted a "course of conduct" as found by the Board. Any course of conduct of lying and deceit would have started on September 13, 1996. Oddly, the Board's finding of a pattern of deception does not refer to Heinen's September 16, 1996, conversation with Richard Mays, the City Administrator, even though by his own admission his confession to Mays of knowledge and responsibility for the letter was equivocal and grudging, consisting of a sequence of inconsistent versions of events until Heinen finally admitted that he knew of the letter and helped to write the last paragraph. Depending on whether or not the Board believed that Heinen was still understating his responsibility for the letter in his testimony before the Board, such a course of conduct could have continued through December 2, 1996. However, the Board made no such findings. It is possible the Board intended to refer to the period beginning September 13, 1996, and continuing to September 16, 1996, but we have no way of discerning the intent other than by the Board's findings.

### Evidence as to a Pattern of Deception from Before August 26, 1996 to September 13, 1996

Regardless of the other findings of fact in its decision, the Board rested its decision on a supposed pattern of deception that lasted from before August 26, 1996, to September 13, 1996. There is no substantial evidentiary support in the record for a finding that there was any "course of conduct" involving "dishonesty" during this period. While it is entirely possible that Lt. Heinen's failure to volunteer information concerning his knowledge of the letter violated some other rule or regulation, or that Heinen's dishonesty during his interview with Chief Brewer on September 13, 1996 was itself sufficient as proof of a lack of good behavior and efficient service, or even that Heinen did indeed engage in a pattern of deception but only beginning on September 13, 1996, it our not our job to make such findings for the Board. We are not entitled to presume that the Board im-

plicitly made these findings. *Webb*, 694 S.W.2d at 928. The Board's findings, in their present form, are inadequate to support Heinen's termination. We therefore remand this case to the Police Personnel Board for additional findings of fact.

## Cross Examination of Chief Brewer

■ Although we remand this case for additional findings, we will nevertheless briefly address Heinen's second point on appeal, namely, that the Board denied him procedural due process when he was not permitted to cross-examine Chief Brewer regarding prior personnel evaluations that supposedly had noted his belligerency towards subordinates. We do so as a matter of judicial economy because, regardless of whether the Board on remand takes additional evidence or simply makes additional findings based on the record as it now stands, this issue requires resolution.

Heinen alleges that he was denied procedural due process when he was not permitted on cross-examination of Brewer to inquire about prior personnel evaluations that included information pertaining to Brewer's harsh treatment of subordinates in the past.[4] Heinen's purpose was to prove that Brewer had a continuing problem with inability to control his temper in his relationships with subordinates, and that the real reason he had terminated Heinen was out of personal animosity.

■ The chair of an administrative agency has wide discretion to control the scope of cross-examination. *Mueller v. Ruddy*, 617 S.W.2d 466, 478 (Mo.App.1981). Cross-examination is limited to matters that are relevant to the issues being litigated and there is "broad discretion in passing upon the permissible scope of cross-examination." *Anderson v. Wittmeyer*, 895 S.W.2d 595, 601 (Mo.App. 1995) (citing *Eickmann v. St. Louis Public Serv. Co.*, 323 S.W.2d 802, 806–07 (Mo.1959)). Leaving aside the question of whether Chief Brewer's prior work history was relevant to

show what his motive was in terminating Heinen, we reject Heinen's argument for the more fundamental reason that Brewer's subjective motive in ordering Heinen's termination was irrelevant to the issue before the Board. The sole issue was whether or not Heinen had failed to conduct himself in a manner consistent with good behavior and efficient service. Chief Brewer's motives were irrelevant to the question before the Board.

Heinen's second point is denied.

## Conclusion

Because of deficiencies related to the findings of the Board, we vacate the judgment of the circuit court and remand this case to the circuit court with instructions to remand the case to the Police Personnel Board with directions to make findings of fact and conclusions of law in accordance with this opinion. The Board need not reopen the hearing for additional evidence prior to adopting new findings and conclusions of law. Each party shall pay its own costs on this appeal.

EDWIN H. SMITH, P.J., and ELLIS, J., concur.

## APPENDIX A

The following letter was received by three members of the City Council of Jefferson City on or about August 30, 1996:

Jefferson City Council Members        August 1996
320 E. McCarty Street
Jefferson City, Missouri 65101

Dear Council Member:

This letter is to call your attention to the inappropriate actions of a city employee. The city employee is the Chief of Police. From the time Tyler Brewer arrived all Police Department employees gave him the benefit of the doubt. However, Chief Brewer has not given the other officers the same respect. Instead, he goes to employees and says nasty little things about other employ-

---

4. Heinen's second Point Relied On also includes an allegation that the Board denied him procedural due process when it permitted the admission of evidence regarding an encounter between Heinen and a department dispatcher. Heinen

barely alludes to this alleged error in the argument under the corresponding point. We consider this alleged error abandoned. *See Luft v. Schoenhoff*, 935 S.W.2d 685, 687 (Mo.App.1996).

ees. He says he does this to find out whom he can trust. He thinks if the nasty little thing he had said does not get to others that he can trust the one he told the secret. This has back fired on him and no one trusts him. He is so intent on finding whom he can trust that he does not realize he is the one who should be working to gain the other officers' trust. After all, he is the new one on the block.

He openly tries to pit the officers against each other. When he does this, the women get so angry, frustrated, and cry bitter tears to get it out of their system. When he tries to pit the men against each other, they get so angry and frustrated with his tactics that they take their frustration out on their families and over indulge in food and beverages. Most employees tend to take more sick time when they have a boss like Chief Brewer. His brow beating leadership tactics show many signs of emotional and mental abuse towards other city employees. Another tactic he uses is to take every word and sentence said and changes the sentence later and uses it against the employee. Employees soon learn to have a witness when talking with Chief Brewer.

Furthermore, Chief Brewer shows no respect towards his spouse. For example, before she moved here she applied for several jobs. One day Chief Brewer's spouse upset him with a telephone call. She received a couple of job rejection letters. When he hung up, Chief Brewer's comment was. "She is nothing but a loser." Wow! Look whom she married.

Chief Brewer is a control freak. During his first six months of reign, he has suspended one employee, threatened to fire two employees, and every one is wondering who is his next target? He should know better to throw stones when there is a sexual harassment complaint filed against him by another city employee. How many more employees will become his victims before the Jefferson City Council disciplines him?

Does the Chief have a twelve month probation period like all other police department employees? How many Council Members would like to work for Chief Brewer? If you would, pity you. If you do not, then why do you subject a whole City Department to him?

There is an eerie still air in the police station. Ranking Officers are afraid to voice their ideas and concerns openly because of Chief Brewer's dishonesty. Moreover, I am unable to sign my name for fear of reprisal against my family and me by Chief Brewer.

A CONCERNED TAXPAYING VOTER